# United States Court of Appeals
## For the First Circuit

No. 07-2770

HARRY C. CROOKER & SONS, INC.,

Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION
AND ELAINE L. CHAO, SECRETARY OF LABOR,

Respondents.

PETITION FOR REVIEW OF AN ORDER OF THE

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

Before

Torruella, <u>Circuit Judge</u>,
Selya, <u>Circuit Judge</u>,
and Domínguez,[*] <u>District Judge</u>.

<u>Gregg R. Frame</u>, with whom <u>James A. McCormack</u> and <u>Taylor, McCormack & Frame</u> were on brief, for petitioner.
<u>Amanda Strainis-Walker</u>, Attorney, with whom <u>Gregory F. Jacob</u>, Solicitor of Labor, <u>Joseph M. Woodward</u>, Associate Solicitor, and <u>Michael P. Doyle</u>, Counsel for Appellate Litigation, were on brief, for respondents.

August 11, 2008

---

[*]Of the District of Puerto Rico, sitting by designation.

**SELYA**, **Circuit Judge**.  The mission of the Occupational Safety and Health Administration (OSHA) is "to assure so far as possible . . . safe and healthful working conditions."  29 U.S.C. § 651(b).  Despite the salutary nature of that mission, there are limits to what OSHA can demand of employers.  This petition for judicial review entreats us to draw such a line: to excuse compliance with an OSHA standard on grounds of infeasibility lest literal enforcement of the standard cripple an entire segment of the construction industry.  Discerning serious evidentiary gaps in the petitioner's thesis, we deny the petition.

The facts are straightforward.  The petitioner, Harry C. Crooker & Sons, Inc. (Crooker), is a general contractor.  On May 16, 2006, Crooker was performing construction work for the municipality of Brunswick, Maine.  During the phase of the contract at issue here, Crooker was progressing down the length of Jordan Avenue, alternately digging up the earth on either side of the road, and replacing underground storm drains, water pipes, and sewer pipes.  To facilitate the work, it used a virtual armada of heavy equipment including bulldozers, front-end loaders, and backhoes.  The individual pieces of equipment were tall, and low-hanging power lines ran up and down the street.

On the date in question, OSHA compliance officer Steve Warner observed one particular backhoe, a CAT 330 excavator, operating in the vicinity of a 240-volt power line suspended

-2-

fourteen feet from the ground. By the driver's estimate, the distance between the power line and the top of the machine was six to seven feet. That was several feet fewer than the ten-foot clearance prescribed by an OSHA regulation governing the operation of mechanized equipment in the vicinity of energized, non-insulated power lines. See 29 C.F.R. § 1926.600(a)(6).[1] Warner wrote up the violation and demanded immediate abatement of the hazard.

Several months later, OSHA issued a formal citation and imposed a $2,800 penalty. Crooker contested the citation and penalty, asserting that compliance with the regulation was infeasible given the on-the-ground realities of carrying out this type of work in a community like Brunswick.

In April of 2007, the parties appeared before an administrative law judge (ALJ). See 29 U.S.C. § 659(c); see also P. Gioioso & Sons, Inc. v. OSHRC, 115 F.3d 100, 102-03 (1st Cir. 1997) (outlining administrative structure for OSHA enforcement). Through briefing and evidence, Crooker advanced three grounds for

---

[1]This regulation cross-references 29 C.F.R. § 1926.550(a)(15)(i), which provides that:
Except where electrical distribution and transmission lines have been deenergized and visibly grounded at point of work or where insulating barriers, not a part of or an attachment to the equipment or machinery, have been erected to prevent physical contact with the lines, equipment or machines shall be operated proximate to power lines only in accordance with the following . . . [f]or lines rated 50 kV. or below, minimum clearance between the lines and any part of the crane or load shall be 10 feet.

-3-

defenestrating the citation: first, that compliance with the regulation was infeasible; second, that on these facts a general industry standard, 29 C.F.R. § 1910.333, should be read to supplant the regulation on which the Secretary of Labor (the Secretary) relied; and third, that the power lines along Jordan Avenue were fully insulated, thus obviating the ten-foot clearance requirement. The ALJ rejected this asseverational array, determined that the Secretary had made out a prima facie case of the violation of an applicable OSHA standard, found that prima facie case unrebutted, and upheld the citation and the associated penalty. See Harry C. Crooker & Sons, Inc., 22 O.S.H. Cas. (BNA) 1135 (2007).

Crooker petitioned for discretionary review before the Occupational Safety and Health Review Commission (the Commission). In that petition, it renewed the main arguments that it had advanced before the ALJ and added a claim that the Secretary had not established a prima facie case. The Commission declined to grant review. Consequently, the ALJ's decision became the Commission's final order. See 29 C.F.R. § 2200.90(d); see also P. Gioioso, 115 F.3d at 103. This timely petition for judicial review followed. See 29 U.S.C. § 660(a).

Judicial review of federal administrative decisions is deferential, reflecting the respect owed to specialized bodies tasked with the orderly administration of national standards and policies. The Commission's adjudications, however, do not command

-4-

Chevron deference. See Martin v. OSHRC, 499 U.S. 144, 151-57 (1991); A.J. McNulty & Co. v. Sec'y of Labor, 283 F.3d 328, 332 (D.C. Cir. 2002); see generally Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984). Nevertheless, in the absence of a conflict with the Secretary's interpretation of a regulation — and there is none here — a reviewing court will uphold the Commission's determinations as long as those determinations are not arbitrary, capricious, abusive of the Commission's discretion, or otherwise contrary to law. See 5 U.S.C. § 706(2)(A); see also Capeway Roofing Sys., Inc. v. Chao, 391 F.3d 56, 58 (1st Cir. 2004). As a subsidiary matter, the Commission's factual findings will stand whenever they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a); see P. Gioioso, 115 F.3d at 108.

Crooker's most developed claim of error focuses on the purported infeasibility of complying with section 1926.600(a)(6). For purposes of judicial review, the Commission's determination of feasibility vel non qualifies as a factual finding. See, e.g., A.J. McNulty, 283 F.3d at 334; S. Colo. Prestress v. OSHRC, 586 F.2d 1342, 1351 (10th Cir. 1978). We review it accordingly.

The premise on which Crooker's infeasibility argument rests is sound: federal law recognizes infeasibility as an affirmative defense in an enforcement action that charges an OSHA violation. See, e.g., E & R Erectors, Inc. v. Sec'y of Labor, 107

F.3d 157, 163 (3d Cir. 1997).  To prevail on an infeasibility defense, the employer must prove (i) that compliance with a particular standard either is impossible or will render performance of the work impossible; and (ii) that it (the employer) undertook alternative steps to protect its workers (or that no such steps were available).  See Bancker Constr. Corp. v. Reich, 31 F.3d 32, 34 (2d Cir. 1994).  And because infeasibility is an affirmative defense, the employer must shoulder the burden of proving each of these elements.  See A.J. McNulty, 283 F.3d at 334; Bancker Constr. 31 F.3d at 34; Brock v. Dun-Par Eng'd Form Co., 843 F.2d 1135, 1138-40 (8th Cir. 1988).

In mounting an infeasibility defense here, Crooker paints a bleak picture of awkward working conditions and on-the-job exigencies, including a jungle of low-hanging power lines and an urgent need to use bulky pieces of equipment to perform the essential work.  Crooker argues that, in combination, these circumstances left it no practical choice but to operate within the ten-foot radius surrounding the energized wires.

According to Crooker, a distinct set of trenching regulations required it to use a backhoe on the scale of the eleven-foot-tall CAT 330 Excavator.  See 29 C.F.R. §§ 1926.650-.652.  As Crooker tells it, the use of that massive equipment

rendered it impossible to work underneath 14-foot-high power lines while maintaining anything close to a ten-foot clearance.[2]

Crooker grants that, according to the text of the regulation at issue, deenergizing the power lines would have solved the problem by mooting the ten-foot clearance requirement. Anticipating this riposte, it offered testimony and affidavits before the ALJ in an effort to show that deenergizing the power lines would have been a practical impossibility. The lines were service drop lines (that is, lines carrying electricity from the main transmission line into individual residences and other structures). As such, they were to be found up and down the length of residential streets like Jordan Avenue and decommissioning them would have required a stream of deenergization requests to the public utility, Central Maine Power Company (CMP).

In an affidavit, an employee of CMP, Carol Purinton, stated that deenergization was the utility's "least preferred option" and in her experience would be unprecedented. Moreover, deenergization of specific lines would require at least twenty-four hours notice to the affected customers.

---

[2]The ALJ gave some weight to Warner's testimony suggesting one way that Crooker could have maneuvered its backhoe in order to maintain a ten-foot clearance at all times. Although we may consider Warner's testimony in this regard despite Crooker's objection to his expertise, we find it unnecessary to do so in order to resolve this petition.

Although not insignificant, such problems fall short of satisfying either of the elements of the infeasibility defense. As to the first element — impossibility — Crooker made only a showing of difficulty, not a showing of infeasibility. Nothing in the record indicates that normal foresight, planning, and patience would not have sufficed to handle the various notice requirements outlined by CMP's representative (and, thus, have paved the way for deenergization).[3] The fact that no prior pipe-laying operation involved the deenergization of service drop lines is not dispositive; the infrequent use of prophylactic measures is not a proxy for impossibility. See Brock v. Williams Enter. of Ga., Inc., 832 F.2d 567, 573 (11th Cir. 1987). Moreover, the fact that deenergization had not occurred on other projects might well be explained by factors other than impossibility — say, lax enforcement or a better layout of power lines.

Crooker places great emphasis on Purinton's statement that deenergization was "the least preferred option" from CMP's standpoint. According to Crooker, this testimony indicates that any attempt at deenergization would have been an exercise in futility. We disagree. At most, Purinton's words imply that CMP

_____

[3]Crooker's general superintendent, John Bishop, testified that shortly before the hearing he contacted CMP about deenergizing power lines and that his request was denied. This testimony does not benefit Crooker's case: the record reveals that CMP refused to deenergize the lines solely because Crooker failed to comply with CMP's stated notice requirements.

would first have explored and exhausted other possible means of accommodating a contractor's request.

Of course, the economics of the situation are relevant; it may be infeasible to require a company to purchase a bazooka to kill an ant. Here, however, the economics do not make a dispositive difference.

To begin, nothing in the record indicates why any additional operating costs incident to deenergization could not be passed along to the municipality. Beyond that, there is nothing in the record to indicate that compliance with this standard would render the work so expensive as to become economically infeasible. Construction standards may be economically feasible even though they are financially burdensome. See S. Colo. Prestress, 586 F.2d at 1351.

It is even more clear that Crooker failed to present sufficient evidence to satisfy the second element of the infeasibility test: that it had sought out other means of protecting its workforce from the targeted hazard (here, electrocution) or, in the alternative, that no such alternatives were feasible. Crooker neither explored alternative means nor took alternative precautions.[4] Thus, its argument reduces to an

_____

[4]Crooker does say that it took one precaution: employing spotters. But Crooker was independently required to use spotters when working in the vicinity of live power lines. See 29 C.F.R. § 1926. 550(a)(15)(iv). Thus, the use of spotters cannot plausibly be considered an alternative precaution.

insistence that no alternative ways of safeguarding its personnel were available.

Purinton's testimony sinks this ship. She outlined several specific alternatives, short of deenergization, that could have served to protect Crooker's employees. These included "cover[ing] up" or "relocating" power lines while work was ongoing. Perhaps these alternatives were themselves infeasible — but Crooker had the burden of proof, and it offered no testimony on this score. Indeed, Crooker never contacted CMP prior to commencing work.

That ends this aspect of the matter. As said, Crooker had the burden of proof on its affirmative defense of infeasibility. Given the paucity of evidence that it submitted with respect to the elements of this defense, we cannot say that the Commission erred in concluding that the burden of proving infeasibility had not been carried.

Crooker next posits that the Secretary should have applied a general industry standard, 29 C.F.R. § 1910.333, to this work site instead of the standard specific to the use of mechanized equipment in the vicinity of live power lines. It contends that, under certain circumstances, a general standard may be significantly more appropriate than a more specific standard and, thus, may preempt the application of the latter.

In framing this contention, Crooker seeks to carve an exception into adamantine bedrock. It is apodictic that if a

particular workplace hazard is within the compass of both a general industry standard and a specific standard, the latter standard controls in the event of any conflict. See 29 C.F.R. § 1910.5(c)(1)-(2); see also Williams Enter., 832 F.2d at 570; cf. Dravo Corp. v. OSHRC, 613 F.2d 1227, 1234 (3d Cir. 1980) (explaining that "the Secretary may hold an employer to the general industry standards in those situations where no specific standard is applicable").

This principle should come as no surprise. It is a conventional canon of legal interpretation that specific provisions trump more general ones. See, e.g., Edmonds v. United States, 520 U.S. 651, 657 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs."); Gómez v. Rivera Rodríguez, 344 F.3d 103, 121 (1st Cir. 2003) (similar); Paul Revere Variable Annuity Ins. Co. v. Kirshhofer, 226 F.3d 15, 21 n.8 (1st Cir. 2000) (similar). Crooker has directed us to no contrary authority, whether in federal statutes, regulations, or case law.

Crooker's contention perhaps can be narrowly construed as advocating the application of a more general standard exactly because compliance with a more specific standard is infeasible. But we already have disposed of the infeasibility defense on other, independent grounds, see supra, thereby rendering this more narrowly targeted claim inapposite, too.

This brings us to Crooker's third assignment of error. The Commission's ground rules require the Secretary to present a prima facie case of the violation of an OSHA standard. See D.A. Collins Constr. Co. v. Sec'y of Labor, 117 F.3d 691, 694 (2d Cir. 1997); N.Y. State Elec. & Gas Corp. v. Sec'y of Labor, 88 F.3d 98, 105 (2d Cir. 1996); Ormet Corp., 14 O.S.H. Cas. (BNA) 2134, 2135 (1991). Crooker maintains that the Secretary defaulted on this obligation in two distinct respects: by failing to present evidence proving either that a hazard existed or that the power lines lacked effective insulation. Both branches of this assertion evince misconceptions about the allocation of burdens of proof.

The claim that the Secretary did not adduce evidence regarding the existence of a hazard is doubly flawed. For one thing, it was waived. Crooker omitted any mention of the claim in his petition to the Commission for discretionary review. That brings into play the settled rule that objections not presented to the Commission cannot be advanced in a subsequent petition for judicial review. See 29 U.S.C. § 660(a); see also P. Gioioso, 115 F.3d at 104-06.

To be sure, there is an exception to the exhaustion rule for situations in which the failure to pursue an objection before the Commission results from extraordinary circumstances. See 29 U.S.C. § 660(a). But nothing resembling extraordinary circumstances

-12-

is evident here.  The exception is, therefore, inaccessible to Crooker.

We add that, even if not waived, the claim would founder because a standard that proscribes certain conditions presumes the existence of a safety hazard.  Thus, "the Secretary need not prove that the violative conditions are actually hazardous."  Modern Drop Forge Co. v. Sec'y of Labor, 683 F.2d 1105, 1114 (7th Cir. 1982); see Simplex Time Recorder Co. v. Sec'y of Labor, 766 F.2d 575, 589 n.7 (D.C. Cir. 1985) (explaining that proof of a violation of the specific standards directed to worker safety suffices to demonstrate the existence of a hazard).  Where, as here, the Secretary promulgates a regulation prohibiting construction equipment from operating within ten feet of power lines carrying up to 50 kV, 29 C.F.R. § 1926.550(a)(15)(i), that regulation speaks for itself, periculum ipsa loquitur.

A similar misprision of the Secretary's burden undermines Crooker's assertion that the Secretary's prima facie case failed for lack of evidence that the power lines were uninsulated.  The text of the applicable regulation identifies the existence of insulation as an exception to the standard.  See 29 C.F.R. § 1926.550(a)(15) ("Except . . . where insulating barriers . . . have been erected to prevent physical contact with the lines . . . .").  As such, an unbroken line of Commission precedent correctly places the burden of both production and persuasion on the party seeking to find shelter under that exception.  See, e.g., Kaspar Electroplating

Corp., 16 O.S.H. Cas. (BNA) 1517, 1522 (1993) ("[T]he party claiming the benefit of an exception to the requirements of a standard has the burden of proof of its claim."); Sec'y of Labor v. Stanbest, Inc., 11 O.S.H. Cas. (BNA) 1222 (1983) (citing United States v. First City Nat'l Bank of Houston, 386 U.S. 361, 366 (1967)) (same). This reasonable approach to interpretation is in harmony with the baseline rule for statutes. See, e.g., Meacham v. Knolls Atomic Power Lab., 128 S. Ct. 2395, 2400 (2008) ("[T]he burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits.") (quoting FTC v. Morton Salt Co., 334 U.S. 37, 44-45 (1948) (internal quotation marks omitted)). We therefore conclude that the Commission permissibly placed on Crooker the burden of proving the presence of effective insulation.

To say more on these points would be supererogatory. The upshot is that the Secretary's prima facie case was not vitiated by the absence of proof that the power lines were uninsulated.

As a parting shot, Crooker warns that, should we uphold the citation and concomitant penalty, we will be rendering the commonplace activity of laying sewer pipe much more burdensome, with dire consequences for infrastructure construction nationwide. Common sense, it says, is reason enough to forgo enforcement of the regulation. This argument lacks force.

In the first place, the evidence in this case does not come close to justifying Crooker's perfervid rhetoric. The lack of proof regarding its claim of infeasibility is conspicuous.

Equally as important, Crooker's warning misperceives our role. The courts of appeals are empowered to assure the reasonable application of OSHA regulations, not to recast those regulations in accordance with judicial intuitions about the proper balance between worker safety and the needs of business. See Chevron, 467 U.S. at 843-44 & n.11; Johnson v. Watts Regulator Co., 63 F.3d 1129, 1135 (1st Cir. 1995). If the regulation here at issue unfairly disadvantages contractors — a matter on which we do not pass — that is for the political branches,[5] not for the courts.

We need go no further. For the reasons elucidated above, the petition for judicial review is denied.

**So Ordered**.

---

[5]Among other options, OSHA has established a specific procedure for modifying or revoking standards when it is desirable to do so. See 29 C.F.R. §§ 1911.3 - .18.