[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-13748

_____

OSHC Docket No. 10-0549

M.C. DEAN, INC.,

Petitioner,

versus

SECRETARY OF LABOR,

Respondent.

_____

Petition for Review of a Decision of the
Occupational Safety and Health Review Commission
_____

(February 1, 2013)

Before HULL, WILSON and HILL, Circuit Judges.

PER CURIAM:

M.C. Dean petitions for review of a final decision of the Occupational Safety and Health Review Commission finding that M.C. Dean violated the Occupational Safety and Health Act ("OSHA") by failing to guard a skylight which resulted in an employee's fall and subsequent death. After careful review of the record and briefs, and with the benefit of oral argument, we deny the petition for review and affirm the Commission's decision.

## I. BACKGROUND

Because the facts underlying M.C. Dean's citation are central to this appeal, we recount them below.

### A.    The Underlying Incident

Petitioner M.C. Dean is an electrical contractor that, among other things, services existing electrical installations. In August 2009, Ryder Transportation Services ("Ryder") hired M.C. Dean to perform electrical equipment upgrades and maintenance at Ryder's warehouse. Tommy McGregor, M.C. Dean's service group manager, selected a three-person team to complete the Ryder project: Boyd Young, Lewis Quinn, and Sam Dittmore. Young and Quinn were both journeymen electricians, while Dittmore was an apprentice electrician.

While McGregor was the team's supervisor, a lead electrician was selected to manage the Ryder project onsite. Because Young had more knowledge and

2

experience with motor controls, service panels, and breakers, Young became the "lead" or "senior man" on the Ryder project.

As lead, Young served as the direct contact with Ryder and managed the project onsite. A Ryder representative communicated directly to Young the tasks to be performed at the job; Young then relayed that information to supervisor McGregor. But if a new task was required, McGregor was not always called before it was added to the task list, and Young had the latitude to service additional work requests. Also in his capacity as lead, Young obtained any necessary materials missing from the jobsite; answered any inquiries from Ryder; and generally determined the manner in which the tasks of the job would be executed. However, Young could not discipline any employee. That duty remained with McGregor. McGregor was also responsible for safety.

The work required for the Ryder project included running conduit and mounting junction boxes along the roof inside the warehouse. The work was completed using an articulating boom lift inside the facility. While working inside the warehouse, the crew noticed rectangular skylights located on the roof of the building.

M.C. Dean's crew had been onsite for approximately two weeks, when on August 27, 2009, Dittmore completed the daily pre-task planner for the Ryder job. The pre-task planner assessed the risks involved in the day's tasks. After Dittmore

3

filled out the planner, Young and Quinn reviewed it, and all three crew members signed it. The pre-task planner noted as safety hazards for the day "[o]thers working in the area" and "finish unenergized circuits using lift." In two places, the pre-task planner noted that the crew would need "100% Fall Protection."[1] The pre-task planner did not mention any hazard related to the skylights or roof. At the time the crew completed the pre-task planner on August 27, they did not know they would have to access the roof that day.

Later that morning, the crew learned that the facility's exhaust fans did not come on with the flip of the switch as they should have after the crew finished rewiring. The crew determined it would have to access the roof to verify the voltage at the exhaust fans. Prior to accessing the roof, Young discussed it with Jeff Thompson, a Ryder employee. Thompson told Young that there was no roof access, but the roof had been accessed in the past via a series of ladders.

As noted above, the Ryder facility's roof had a number of skylights that were apparent from the ground inside the building. However, on the roof, the skylights were nearly invisible, as the color and texture of the corrugated roof and skylight panels were virtually identical. The skylight panels were approximately 25 feet apart on the roof, and no skylight was within six feet of either exhaust fan

---

[1]The term "100% Fall Protection" referred to an M.C. Dean six-foot rule whereby an employee must be "tied off" (e.g., wear a harness) if the employee is working within six feet of a fall hazard.

that the crew would be required to access.  Thompson and Young did not discuss

the skylights on the roof, and Young did not inquire as to whether the skylights had

a guardrail or screen, or whether they were clearly marked.

The crew decided to access the roof using the boom lift.  Because Quinn had

the most experience with the lift, Quinn used the lift to access the roof.  Quinn

wore a safety harness (i.e., fall protection) while transported in the lift from the

ground to the roof.  Once he exited the lift onto the roof, Quinn did not use a

harness.  Quinn was on the roof for 15 or 20 minutes and remained in constant

radio contact with Young.  After testing the two exhaust fans, Quinn fell through a

skylight 25 feet to the facility's concrete floor below.  Two weeks later, Quinn died

from his injuries.

## B.    The OSHA Inspection and Citation

On September 11, 2009, Reinaldo White, an OSHA compliance officer,

conducted an investigation at the Ryder facility after Quinn's death.  After his

investigation, White recommended, and the Secretary of Labor issued, a single

"serious" citation to M.C. Dean for failing to guard the skylight openings in

violation of 29 C.F.R. § 1910.23(a)(4).[2]  White recommended its categorization as

a "serious" violation because of Quinn's death.  The proposed penalty was $7,000.

---

[2]The Secretary also cited Ryder, alleging violation of the same provision.  In a decision
and order dated February 28, 2011, another administrative law judge vacated the citation.  The
Secretary requested and was granted review of the decision by the Occupational Safety and
Health Review Commission, before which it remains pending.

M.C. Dean contested the citation and penalty to an administrative law judge of the Occupational Safety and Health Review Commission (the "Commission").[3]

## C.    The Administrative Law Hearing and Decision

On September 2 and 3, 2010, an administrative hearing was held before an administrative law judge ("ALJ").  The ALJ heard testimony from Reinaldo White, Boyd Young, Tommy McGregor, and M.C. Dean's Vice-President of Safety John Bennett.

Boyd Young testified as to the events of August 27, 2009.  Young estimated that the skylights were located 25 feet away from the exhaust fans on the roof. Young also testified about the six-foot rule, and stated that he and Quinn had been trained on the six-foot rule.  Young had no reason to believe Quinn would go within six feet of any of the skylights.  But Young testified that he had never before seen those kinds of flush skylight panels.

Tommy McGregor testified that on the day of the accident, Young was designated lead, but neither Quinn nor Young were considered supervisors. McGregor defined the term "field supervisor" as a "general term" referring to when "someone is watching over or dictating the task."  But if a serious problem

---

[3]The Commission is an independent adjudicative forum for citation disputes.  29 U.S.C. §§ 659, 661.  When an employer contests an OSHA citation by the Secretary, a hearing is held by an administrative law judge of the Commission.  A party dissatisfied with the decision of the administrative law judge may then petition for discretionary review by a three-member Commission panel.  29 U.S.C. §§ 659(c), 661(j).

6

arose on the jobsite, the crew would have called McGregor, as it was his duty to take care of those issues. Specifically, if an employee violated safety requirements, it was McGregor's responsibility to take care of it. McGregor would visit jobsites, but it would vary as to how often he visited. McGregor did not go to the Ryder jobsite until after the accident.

McGregor testified that on the day of the accident, he was not aware that the crew was going to go on the roof as it was not part of the original scope of work. McGregor also testified that it was rare for M.C. Dean employees to be required to access a roof, and that after the incident, M.C. Dean instituted a roof permitting process whereby employees must obtain a roof access permit before accessing a roof.

John Bennett testified to M.C. Dean's extensive safety training program, including its emphasis on fall protection. Bennett also testified that he would consider the persons in charge of safety on a jobsite to be those present: "I would look at Lewis Quinn and Boyd Young as being equally responsible because they were at equal levels, but taking in consideration of the fact that Tommy assigned Boyd as the lead person because he was more familiar with the type of work at that time."

After the hearing and after reviewing the parties' post-hearing briefs, the ALJ affirmed the citation and assessed the recommended penalty of $7,000. The

7

ALJ determined that the Secretary had met her burden of showing M.C. Dean had knowledge of the fall hazard posed by the skylight. The ALJ found that M.C. Dean had that knowledge through the constructive knowledge of Young, whom she deemed an onsite supervisor. Specifically, the ALJ found that (1) M.C. Dean had assigned Young as the onsite field supervisor or lead for the day of the accident; (2) Young controlled the "method and manner" in which the crew performed the assigned tasks and he maintained the ability to assign tasks to other employees, including other journeymen; (3) McGregor relied on Young to determine the tasks to be performed at the warehouse; (4) Young served as M.C. Dean's contact with Ryder and had the "latitude" to agree on changes or modifications to the project; and (5) M.C. Dean's Vice-President of Safety Bennett testified McGregor had to rely on Young as his "lead person" to monitor safety at the worksite. The ALJ found that although Young did not have the authority to hire or fire, Commission precedent did not hold such power as the "sine qua non of supervisory status."

The ALJ also rejected M.C. Dean's argument that it should not be cited because of its effective safety rules and enforcement of those rules. The ALJ found that although the lack of guarding of the skylights "was not 'readily apparent' from the ground, the existence of the skylights was." But when the M.C. Dean crew determined that they needed to access the roof, no new risk assessment

8

was performed.  Significantly, Young admitted that a skylight hazard should have been included on the pre-task planner.  Further, because M.C. Dean's employees rarely worked on roofs, the lack of experience with roofs made Young's failure to investigate the conditions on the roof and discuss safety issues related to the roof even more questionable.  Because the record evidence established that Young failed to exercise reasonable diligence to anticipate the skylight hazard, and because Young's knowledge could be imputed to M.C. Dean, the ALJ upheld the citation and assessed the proposed penalty.

The ALJ also rejected M.C. Dean's affirmative defenses of infeasibility and greater hazard because, respectively, (1) M.C. Dean failed to introduce any evidence that installing fall protection for the skylights would have had a severe adverse economic effect on the company; and (2) M.C. Dean failed to introduce any evidence to establish that abating the skylight hazard would have been more hazardous than allowing Quinn to walk on the roof unprotected.

M.C. Dean filed a petition for discretionary review with the Commission, which was denied.  M.C. Dean then filed the present petition for this Court's review.

## II. STANDARD OF REVIEW

Where the Commission does not direct review of an ALJ's decision, the ALJ's findings become the Commission's.  See 29 U.S.C. § 661(j).

9

The Court's review of Commission decisions is limited and highly deferential.  See Fluor Daniel v. Occupational Safety & Health Review Comm'n, 295 F.3d 1232, 1236 (11th Cir. 2002).  The Court must sustain the Commission's fact-findings as long as they are "supported by substantial evidence on the record considered as a whole."  29 U.S.C. § 660(a).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  J.A.M. Builders, Inc. v. Herman, 233 F.3d 1350, 1352 (11th Cir. 2000) (internal quotation marks omitted).  The Commission's legal determinations will be upheld unless "they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law.'"  Fluor Daniel, 295 F.3d at 1236 (quoting 5 U.S.C. § 706(2)(A)).  The Commission and the ALJ are bound to follow the law of the circuit to which a case will likely be appealed.  See Interstate Brands Corp., 20 BNA OSHC 1102, at *2 n.7 (No. 00-1077, 2003).

### III. DISCUSSION

M.C. Dean challenges its citation for violating 29 C.F.R. § 1910.23(a)(4), a standard which provides that "[e]very skylight floor opening and hole shall be guarded by a standard skylight screen or a fixed standard railing on all exposed sides."  See also 29 U.S.C. § 654(a)(2) ("Each employer . . . shall comply with occupational safety and health standards promulgated under this chapter.").  To

10

make a prima facie showing of a violation of an OSHA standard, the Secretary of Labor must prove that: (1) the standard applies; (2) the employer failed to comply with the terms of the standard; (3) employees had access to the violative condition; and (4) the employer had actual or constructive knowledge of the violation. Access Equip. Sys., Inc., 18 BNA OSHC 1718, at *3 (No. 95-1449, 1999).

This appeal concerns only the fourth element. Specifically at issue is whether M.C. Dean knew, or with the exercise of reasonable diligence could have known, of the violative condition—that is, the unguarded skylights on the Ryder facility's roof. See Astra Pharm. Prods., 9 BNA OSHC 2126, at *4 (No. 78-6247, 1981). M.C. Dean argues that (1) the ALJ erred in imputing Boyd Young's actual or constructive knowledge to employer M.C. Dean, and (2) even if Young's knowledge could be imputed, Young had neither actual nor constructive knowledge of the violative condition.

A.    **Whether Boyd Young is a supervisor whose knowledge is imputable to employer M.C. Dean.**

Actual or constructive knowledge of a violative condition can be imputed to the cited employer through a supervisory employee. Access Equip. Sys., 18 BNA OSHC at *9. "It is well-settled that an employee who has been delegated authority over other employees, even if only temporarily, is considered to be a supervisor for the purposes of imputing knowledge to an employer." Id. But "[i]t is the

11

substance of the delegation of authority that is controlling, not the formal title of the employee having this authority." Id. (internal quotation marks omitted).

M.C. Dean argues that Young's designation as lead or field supervisor was not substantive and endowed him with no authority over his coworkers. M.C. Dean contends that Young's designation only meant he coordinated the project, but he otherwise lacked other indicia of supervisory authority, like the ability to discipline employees.

While the question is close, we conclude that the ALJ's determination that Young qualified as a supervisory employee was in accord with law and supported by substantial evidence. The ALJ found, and we agree, that Young possessed enough supervisory authority to qualify as a supervisor, most importantly the authority to direct the work of the other team members. As the ALJ found: (1) Young was the designated lead or field supervisor the day of the accident; (2) Young controlled the "method and manner" in which the team performed the assigned tasks, and maintained the ability to assign tasks to other employees; (3) McGregor relied on Young to determine the tasks to be performed; (4) Young served as M.C. Dean's contact with Ryder and had the "latitude" to agree on changes or modifications to the project; and (5) M.C. Dean's Vice-President of Safety, John Bennett, testified McGregor had to rely on Young as his "lead person" to monitor safety at the worksite. The fact that Young lacked the ability to hire,

12

fire, or discipline other employees is not dispositive. Thus, the ALJ's determination that Young was a supervisor whose knowledge of the violative skylight condition could be imputed to employer M.C. Dean was not in error. Cf., e.g., Diamond Installations, Inc., 21 BNA OSHC 1688, at *1-2 (No. 02-2080, 2006) (concluding that an employee qualified as an imputable supervisor for a forklift-related citation where the employee (1) was selected by the employer to serve as gang foreman; (2) could direct the work of the crew members and instruct an uncooperative employee to report to the general foreman; and (3) was responsible for the operation of the forklift and was instructed not to give the key to an unauthorized forklift operator); Access Equip. Sys., 18 BNA OSHA at *9-10 (concluding that employee was imputable supervisor where employee was "in charge of" the two other employees onsite); Ga. Elec. Co. v. Marshall, 595 F.2d 309, 321 & n.29 (5th Cir. 1979) (finding sufficient evidence that boom truck operator was an imputable supervisor as he was in charge of the pole crew and decided which poles would be erected, and the employer's designated supervisor had several other crews to supervise and spent less than one-half hour a day with the pole crew).

**B.     Whether Young had constructive knowledge of the violative condition.**

M.C. Dean next claims that the ALJ erred in equating Young's knowledge that an employee was going up on the roof with the company's knowledge that the

13

employee would be exposed to a hazard.  M.C. Dean argues that it was not reasonably anticipated that any employee would be required to go on the roof to perform work, and Quinn's activities could have been completed without his ever being exposed to the harm of going within six feet of an unguarded skylight.

The Secretary does not argue that M.C. Dean had actual knowledge of the skylight hazard.  Thus, the issue is whether M.C. Dean through its supervisor Boyd Young had constructive knowledge of the hazard.  Constructive knowledge is established "by showing that an employer could have known of the violative conditions if it had exercised reasonable diligence."  Phoenix Roofing, Inc., 17 BNA OSHC 1076, at *4 (No. 90-2184, 1995).

Here, the ALJ found that Young had constructive knowledge of the violative condition and made findings that demonstrated Young's constructive knowledge.  Those findings are supported by substantial evidence.  The ALJ noted that while the lack of guarding on the skylights was not apparent, the existence of the skylights was.  The M.C. Dean crew had worked within the Ryder facility for two weeks and observed the skylights within the facility.  Per OSHA's regulations, a skylight must "be guarded by a standard skylight screen or a fixed standard railing on all exposed sides."  29 C.F.R. § 1910.23(a)(4).  Yet, when it was learned the crew would have to access the roof, Young did not inquire as to whether the skylights complied with that standard.  While the facility did not belong to M.C.

14

Dean, Young testified that erecting a temporary guardrail around the skylights would not have been difficult to do. Young also conceded that skylights were a unique hazard that should have been included in the pre-task planner.

Young recognized the unique hazard presented by the skylights. And Young, through the exercise of reasonable diligence, could have determined whether the skylights were marked or guarded. Thus, Young had constructive knowledge of the hazard. And as determined above, that constructive knowledge may be imputed to M.C. Dean. Accordingly, we conclude that the ALJ's fact-findings are supported by substantial evidence and her legal determinations were in accord with law when she found M.C. Dean had constructive knowledge of the violative condition.[4]

## C.   M.C. Dean's affirmative defenses.

Finally, M.C. Dean argues that the ALJ erred in rejecting M.C. Dean's

---

[4]M.C. Dean primarily relies on the Fifth Circuit's decision in Horne Plumbing & Heating Co. v. Occupational Safety & Health Review Commission, 528 F.2d 564 (5th Cir. 1976), but that case is materially distinguishable. In Horne, the journeyman-foreman's knowledge of a violative condition was not imputed to the employer who had done everything within its power to guarantee the safety of its employees. Id. at 570. The Fifth Circuit noted that the employer had an outstanding safety program, and that both men killed in the accident were experienced foremen and journeymen plumbers that had understood the employer's safety instructions. Id. at 566-67. Accordingly, the Fifth Circuit held that "on the facts of this case, it was error to find [the employer] liable on an imputation theory for the unforeseeable, implausible, and therefore unpreventable acts of his employees." Id. at 571. Here, although M.C. Dean maintained a six-foot fall protection rule, it did not maintain a roof access policy prior to this incident. Further, that six-foot rule was ineffective in this situation where the color and texture of the corrugated roof and the skylight panels were nearly identical so that the skylights were not readily visible when on top of the roof. In these particular circumstances, we cannot say M.C. Dean did everything within its power to guard against this particular hazard.

15

affirmative defenses of infeasibility and greater hazard.

M.C. Dean argues that the ALJ wrongly concluded that safety measures suggested by the compliance officer, which the ALJ acknowledged would take between two and five hours to set up, were not infeasible where it was undisputed that Quinn's entire on-the-roof exposure required no more than 15 to 20 minutes. And the ALJ wrongly dismissed the alternative means of fall protection that was in fact implemented: the six-foot rule. It was possible to access all the points necessary on the roof for the job without coming within six feet of a skylight or unprotected edge.

To establish infeasibility, M.C. Dean must prove "(i) that compliance with a particular standard either is impossible or will render performance of the work impossible; and (ii) that it (the employer) undertook alternative steps to protect its workers (or that no such steps were available)." Harry C. Crooker & Sons, Inc. v. Occupational Safety & Health Review Comm'n, 537 F.3d 79, 82 (1st Cir. 2008); see also, e.g., A.J. McNulty & Co., 19 BNA OSHC 1121, at *10 (No. 94-1758, 2000), petition for review denied, 284 F.3d 328 (D.C. Cir. 2002).

M.C. Dean claims that compliance with the cited standard would have been economically infeasible because compliance would have required work on the roof between two and five hours, whereas Quinn was able to complete his work on the roof in approximately 15 to 20 minutes. However, to prove economic infeasibility,

16

M.C. Dean must show "that the increased length of time necessary would have had a 'severe adverse economic effect' on the company." Dayton Tire, Bridgestone/Firestone, 23 BNA OSHC 1247, at *12 (No. 94-1374, 2010), aff'd in part, vacated in part on other grounds, 671 F.3d 1249 (D.C. Cir. 2012); see also, e.g., Crooker & Sons, 537 F.3d at 84 (rejecting infeasibility defense where, inter alia, nothing in the record indicated that compliance with the OSHA standard would "render the work so expensive as to become economically infeasible"). Quite simply, M.C. Dean presented no evidence that compliance with the skylight standard was impossible, would render performance of the work impossible, or would cause severe financial hardship for the company.

M.C. Dean argues that the six-foot rule constituted adequate alternative protection. But such a rule could not constitute adequate protection in a situation in which the fall hazards from which the employee had to maintain a distance of at least six feet were not readily discernible. Thus, the Commission did not err in its conclusion that M.C. Dean failed to carry its burden to establish the affirmative defense of infeasibility.

Finally, M.C. Dean's last defense—that guarding the skylight presented a greater hazard than allowing Quinn to work near the unguarded skylight—fails. To establish the affirmative defense of greater hazard, the employer must prove that: (1) the hazards of complying with the cited standard would have been greater

17

than the hazards of noncompliance; (2) alternative means of protecting employees were either used or were not available; and (3) a variance was unavailable or inappropriate.  E&R Erectors, Inc. v. Sec'y of Labor, 107 F.3d 157, 163 (3d Cir. 1997).

In short, M.C. Dean presented no evidence that protecting against the hazard presented a greater danger than allowing Quinn to walk on the roof unprotected. Thus, the Commission properly rejected this defense.

## IV. CONCLUSION

For the foregoing reasons, we deny M.C. Dean's petition for review and affirm the Commission's decision.

**AFFIRMED.**