GREG KAYS, CHIEF JUDGE
This criminal case arises from the death of a young steel connector ironworker, Eric Roach ("Roach") on a construction site. On July 24, 2014, Roach fell while walking across a steel beam while not tied off on the steel or otherwise protected from falling. As a result, he fell 36 feet to the ground and died the next day from his injuries.
The Government alleges Roach's death was the result of two violations of Occupational Safety and Health Administration ("OSHA") regulations. The Government has charged a subcontractor on the project, Defendant DNRB, Inc., d/b/a Fastrack Erectors ("Fastrack"), with a single count of violating 29 U.S.C. § 666(e), violating OSHA regulation and causing death.[1]
Fastrack requested a bench trail, and the Court heard evidence for two days. Both parties then submitted proposed findings of fact and conclusions of law (Docs. 66 and 67). After carefully weighing all the evidence, the Court finds Fastrack GUILTY.
Findings of Fact
Although this memorandum order and verdict discusses some of the evidence in detail, the Court's failure to discuss any particular piece of evidence should not be construed as a comment on its probative value. In reaching its verdict, the Court has carefully considered all of the evidence in the record.
The Court finds that all of the witnesses were generally credible, with a few exceptions. The Court gave the testimony of Fastrack foremen Bob Wiechens and Tim Goss little weight. Their testimony appeared designed to minimize Fastrack's responsibility for Roach's death and was contradicted by more credible testimony and evidence. Additionally, at times their demeanor while testifying suggested they were not being truthful. The Court also gave reduced weight to the Matt White's testimony because it was inconsistent with more credible evidence.
Fastrack's Role at the Job Site
Defendant Fastrack is a steel erection company based in St. Louis. Although most of its work was performed in Missouri, it also performed work outside of *1057 the state. As of July 2014, it had worked on construction projects in Louisiana, Oklahoma, Arizona, Illinois, and Tennessee. Fastrack also utilized construction equipment, such as a Genie brand lift, that was manufactured outside of Missouri and brought into the state in the course of interstate commerce.
The construction project where Roach was working at the time of his death was a 300,000 square-foot warehouse located in Kansas City, Missouri ("the job site"). ARCO, who is not a party to this case, was the general contractor on the site. ARCO hired Fastrack as the subcontractor to erect the warehouse's steel frame. Fastrack, in turn, arranged with a Kansas City area union, Ironworkers Local 10, to supply ironworkers to the job site. These ironworkers were Fastrack employees while working on the job site.
The Fastrack - ARCO Pre-Construction Safety Meeting
Before Fastrack began work on the job site, ARCO held a meeting with it to discuss several safety related items, including fall protection policies. Several Fastrack foremen, including Bob Wiechens ("Wiechens"), attended this meeting.
During this meeting, Fastrack's foreman exhibited awareness and understanding of the various OSHA regulations governing fall protection, including OSHA regulations 29 C.F.R. §§ 1926.760(a)(1) 2 and (b)(1),[3] which require employees engaged in steel erection activities be protected from fall hazards while working more than fifteen feet and thirty feet, respectively, above a lower level or the ground. Fastrack also committed to following and enforcing several safety polices, including a rule that employees would be required to tie off 100 percent of the time they were working more than six feet above the ground.
As demonstrated by subsequent events, Fastrack did not honor this pledge. At least with respect to fall protection on the job site, Fastrack's policy was to say one thing and do another. For example, the Friday before Roach fell Fastrack supervisors held a "toolbox talk" with ironworkers to purportedly emphasize the 100 percent tie off policy. But Fastrack never enforced this policy. In fact, Fastrack's foremen knew ironworkers on the job site routinely violated this policy, and they allowed these violations to continue.
Roach Worked as a Connector on the Raising Crew
Fastrack employed three different crews of ironworkers on the site: (1) the "raising" crew that erected the building's steel infrastructure, (2) the detail and decking crew, and (3) the off-loading crew.
The raising crew built the infrastructure by setting the metal columns, beams, trusses, and bar joists into place, and then placing or "landing" bundles of steel roof decking ("decking") onto the infrastructure. This crew consisted of two connectors,[4] Roach, a 22 year-old journeyman ironworker, and Timothy "Ryan" Oden *1058 ("Oden"); two riggers, Shawn Sigman and Trevor Donovan; and the crane operator, Evan Noble ("Noble"). Fastrack foreman Wiechens supervised the raising crew.
The raising sequence was as follows. A crane lifted the columns into place, and then the connectors secured the columns into place with bolts or welds. The connectors then bolted or welded trusses or beams on top of the upright columns. The crane then lifted joists onto the structure, and the connectors welded the joists into place and installed bar joists between the trusses. The connectors then set the joists into slots in the wall, which were then bolted to the beams and trusses and welded to the wall. Roach and Oden performed this work primarily while standing in lifts, but sometimes while standing on the top of the steel structure.
The next step in the process of erecting the building's steel structure was "landing" bundles of decking, that is, moving bundles of decking from the ground to the top of the structure by crane. This process began on the ground with a rigger attaching a thick cable around a bundle of decking, and then attaching this bundle to the crane's hook. The crane then lifted the bundle to the top of the structure where the connectors-Roach and Oden-landed it.
A bundle of decking often turned as it was being lifted, and so the connectors would have to turn or align the bundle so that when the crane set it down, it rested parallel to the truss with both ends supported by a bar joist.[5] As they landed each bundle, the connectors would stand on the top of the steel structure so that, if necessary, they could turn the bundle into position.
Background Information Concerning Personal Fall Arrest Systems
Much of the evidence at trial concerned fall protection devices used to protect workers from falling. One device that is particularly important to this case is a personal fall arrest system.
A personal fall arrest system consists of a worker wearing a harness with one or more shock-absorbing lanyards that is attached to a secure anchorage point. An anchorage point is a secure point of attachment which is an independent means of stopping a worker's fall. To qualify as an anchorage point, an attachment point must be able to sustain 5,000 nominal force pounds without failing. Equipment that can act as anchorage points, or that can be used to attach to anchorage points, include a "choker,"[6] a standee or stanchion,[7] a *1059 retractable or "yo-yo,"[8] a "beamer,"[9] and a static line.[10]
A harness and lanyard will not, by itself, prevent a worker from falling. The lanyard must be attached to a secure anchorage point. A part of a building's structure, such as a steel truss, can be used as an anchorage point, so long as it has been welded or bolted into place and is secure. An ironworker may not-as Fastrack suggested during trial-tie off to the cross members on a joist (also called "webbing") because such cross members are not designed to handle the vertical loads involved in stopping the weight of a falling worker.
Exhibits 86 and 87 are examples of harnesses and lanyards worn by the ironworkers at the job site. The harness Roach used had two lanyards that could be used to tie off to separate anchorage points.
Fastrack Did Not Provide Necessary Safety Equipment
Fastrack did not follow the normal practice of steel erection employers and supply chokers to ironworkers at the job site. On their first day on the job, Roach and Oden asked Wiechens for fall protection equipment such as stanchions, retractables, and chokers. Oden, in fact, asked Wiechens at least twice for fall protection equipment, and Wiechens told him they did not have any and they were not going to get any. Oden and Roach also searched the company truck and "gang boxes"[11] for fall protection equipment, but there was none.
Several ironworkers complained about the lack of fall protection equipment on the job site to the union steward, Michael Weddle ("Weddle"). Weddle, in turn, asked Wiechens for safety equipment or fall protection equipment but was not given any. Weddle also looked for fall protection equipment in the gang boxes, and found very little usable equipment.
Fastrack also did not provide any beamers, retractables, or equipment to set up a static line, an alternate system to provide fall protection.
The only personal fall protection Oden and Roach had were their own personal harnesses and lanyards, and two chokers which Roach had brought for him and Oden to use. At some point, Roach also borrowed a choker from another ironworker.
Oden and Roach used the chokers only when performing stationary work on the structure. Even then, they were not always usable. For example, they could not use them when installing joists into slots in the building's wall because there was nothing to which they could tie off. To be protected at such times they needed other safety equipment, which Fastrack did not provide.
Fastrack Permitted Oden and Roach to Work Without Fall Protection
After their first day on the job, Oden and Roach did not tie off while landing decking, which meant they spent a fair *1060 amount of time working more than 30 feet above the ground without fall protection. Wiechens knew that Oden and Roach were not tied off while landing decking during this time.[12]
Despite knowing that Oden and Roach were not wearing fall protection while working more than 30 feet above the ground, Wiechens never disciplined or admonished either of them. None of the Fastrack foremen disciplined any ironworkers on the job site for failing to use fall protection equipment.
The Fatal Accident
On July 24, 2014, Roach and Oden were working landing decking. Although both were wearing a harness and lanyards, their lanyards were not attached to anything. After successfully landing a bundle of decking, Roach and Oden turned and walked back to opposite ends of the truss. While walking back, Eric Roach fell more than 36 feet onto a concrete pad. No one was watching him at the moment he fell, and it is unknown exactly why he fell. He died a day later as a direct result of injuries sustained in the fall.
Fastrack Routinely Ignored Fall Protection Requirements For Other Ironworkers
Roach's not being tied off at the time of the accident was not an isolated safety violation. It was one of many instances where Fastrack failed to observe or enforce OSHA regulations. For example, ironworkers routinely climbed out of lifts and onto the building's steel structure without being tied off. And on the day of the accident, four ironworkers-foreman Tim Goss ("Goss"), Bryan Cravens, Justin Hunter, and Michael "Gage" Nitzschke ("Nitzschke")-were performing decking work[13] thirty-six feet above the ground without adequate, functional means of fall protection. Fastrack had only two retractables available for use by these four workers, and one of them was broken. Goss knew the retractable was broken, but he allowed its continued use anyway. In fact, Goss did not wear fall protection when installing decking himself, nor did he require the ironworkers he supervised to wear a retractable or be tied off. He even told Nitzschke, an apprentice ironworker, that he did not have to wear a retractable and that it was up to him if he wanted to tie off.
Fastrack Knew of OSHA Regulations 29 C.F.R. §§ 1926.760(a)(1) and (b)(1)
Finally, the Court finds Fastrack knew of, and was well acquainted with, OSHA regulations 29 C.F.R. §§ 1926.760(a)(1) and (b)(1) and their requirements. Indeed, *1061 Fastrack had previously been cited for violating 29 C.F.R. § 1926.760(a)(1).
Conclusions of Law
To prove a criminal violation under 29 U.S.C. § 666(e), the Government must prove four elements: (1) the defendant is an employer (that is, a person engaged in a business affecting commerce who has employees); (2) that violated an OSHA regulation; (3) the violation was willful; and (4) the violation caused the death of "any employee." 29 U.S.C. §§ 652 (defining "employer" and "commerce"), 666(e) (stating the elements). The Government bears the burden of proving each element of a count beyond a reasonable doubt, and failure to prove any element beyond a reasonable doubt requires acquittal. United States v. O'Brien , 560 U.S. 218, 130 S.Ct. 2169, 2174, 176 L.Ed.2d 979 (2010).
The Court finds the Government has carried its burden of proving each element beyond a reasonable doubt.
A. Fastrack is an employer under § 666(e).
Fastrack argues the Government failed to prove the first element because it failed to show that Fastrack employed Roach or that it was engaged in interstate commerce. Both arguments are meritless.
The record contains ample evidence proving Roach was a Fastrack employee at the time of the accident. David Maloney, the OSHA safety specialist and compliance officer who investigated Roach's fall, testified at length about what he observed and learned in the course of his investigation. He repeatedly identified Fastrack as Roach's employer, and Roach as Fastrack's employee. Additionally, Oden and the other ironworkers testified they worked for Fastrack. Finally, there is no contrary evidence in the record suggesting Roach and the other ironworkers were not Fastrack employees.[14]
The record is similarly clear that Fastrack engaged in interstate commerce. Although most of its work was performed in St. Louis where it was headquartered, it also contracted for work across state lines in Louisiana, Oklahoma, Arizona, Illinois, and Tennessee.[15] Fastrack also used equipment that was brought into Missouri from out of state. This is more than enough to establish Fastrack engaged in interstate commerce. See 29 U.S.C. § 652(3) (defining "commerce" as "trade ... commerce ... among the several States, or between a State and any place outside thereof"); see also United States v. Sullivan , 332 U.S. 689, 697, 68 S.Ct. 331, 92 L.Ed. 297 (1948) (expanding Congress's power to regulate *1062 under the Commerce Clause, affirming the conviction of a retail druggist for misbranding two pill boxes that had been shipped from one state to another).
B. Fastrack violated 29 C.F.R. §§ 1926.760(a)(1) and (b)(1).
The Information charges Fastrack violated OSHA regulations 29 C.F.R. §§ 1926.760(a)(1) and (b)(1). In order to establish a violation of either regulation, the Government must prove: (1) the regulation applied; (2) its requirements were not met; (3) the employee was exposed to, or had access to, the violative condition; and (4) the employer knew of the violation. See Omaha Paper Stock Co. v. Sec'y of Labor , 304 F.3d 779, 804 (8th Cir. 2002).
The Government established beyond a reasonable doubt that Fastrack violated both regulations. First, it showed the regulations applied. It demonstrated § 1926.760(a)(1) applied because Roach was a Fastrack employee engaged in steel erection activity and walking on an unprotected surface more than 15 feet above a lower level. It demonstrated § 1926.760(b)(1) applied because Roach was a connector working more than 30 feet above a lower level.
Second, the Government proved Fastrack failed to meet the regulations' requirements because Roach routinely worked on trusses and joists more than 15 feet and 30 feet, respectively, above a lower level, the ground, without fall protection. At the time he fell, Roach was working without any kind of fall protection; he was not protected by a guardrail, safety net, personal fall arrest system, positioning device system, or fall restraint system. Although he was wearing a harness with two lanyards, it did not qualify as personal fall arrest system because neither lanyard was attached to an anchorage point. 29 C.F.R. § 1926.751.
Third, the Government showed that Roach was exposed to the violative condition, that is, a fall hazard, because he was working more than 30 feet above a lower level without fall protection.
Fourth, Fastrack knew these violations were occurring because its foreman, Wiechens, knew they were occurring. See M.C. Dean, Inc. v. Secretary of Labor , 505 F. App'x 929, 934-35 (11th Cir. 2013) (holding a supervisor's knowledge is attributed to the supervisor's employer).
Hence, the Government proved Fastrack violated both regulations.
C. Fastrack's violation was willful.
A "willful" violation of 29 U.S.C. § 666 is one "committed with intentional, knowing or voluntary disregard for the requirements of the Act or with plain indifference to employee safety." Sec'y of Labor v. Valdak Corp. , 17 O.S.H. 1135, 1995 WL 139505, at *2 (Rev. Comm'n 1995) ; see Valdak Corp. v. OSHRC , 73 F.3d 1466, 1469 (8th Cir. 1996) (affirming reviewing commission's decision finding a willful violation). A willful violation is "an act done voluntarily with either an intentional disregard of, or plain indifference to, the Act's requirements." Valdak Corp. , 73 F.3d at 1469. To be willful, the employer must be aware of both the essential facts indicating a hazardous condition and the legal requirement to make it safe. While Section "666(e) calls for proof of knowledge of the safety hazard," it does not require "proof that the employer set out to kill an employee or had another evil motive." United States v. Ladish Malting Co. , 135 F.3d 484, 491 (7th Cir. 1998) (Easterbrook, J.)
Willfulness can be imputed to an employer from the knowledge and willful actions or omissions of its supervisory personnel. See *1063 Caterpillar Inc. v. Occupational Safety and Health Review Com'n., 122 F.3d 437, 440 (7th Cir. 1997). These supervisory personnel include foremen. See M.C. Dean, Inc. , 505 F. App'x at 934-35 (affirming that an employee who had been designated as the field supervisor on the day of the accident and who controlled the method and manner in which others performed tasks qualified as a supervisor for purposes of attributing knowledge to the employer). Here there is a mountain of evidence that Wiechens and Goss were aware of, and plainly indifferent to, violations of 29 C.F.R. §§ 1926.760(a)(1) and (b)(1), hence Fastrack was aware of, and plainly indifferent to, these violations. Thus, Fastrack willfully violated the regulations.
The Court rejects Fastrack's claim that it had an "undisputed commitment to safety" which negates any finding of willfulness. Fastrack's purported "undisputed commitment to safety" on the job site was, at least with respect to fall protection, illusory. The violations that led to Roach's death were not isolated occurrences. Fastrack's foremen repeatedly failed to enforce fall protection rules.
D. Fastrack's violations of the OSHA regulations caused Roach's death.
Finally, the Court turns to the last element, causation.
In order to convict a defendant of a criminal offense that includes a causation element, the government must prove beyond a reasonable doubt that the defendant's conduct was both the cause in fact and the 'legal cause' of the relevant harm. To prove that a defendant's conduct was the 'cause in fact' of a harm, the government usually must demonstrate that the defendant's conduct was the 'but-for cause' of the harm. In other words, the government must show that but for the defendant's conduct, the harm would not have occurred. A defendant rebuts this argument by showing that the harm would have occurred in any event, regardless of the defendant's conduct.... To prove that a defendant's conduct was the 'legal cause' (or 'proximate cause') of a harm, the government must prove that the harm was a foreseeable and natural result of the conduct.
United States v. Pitt-Des Moines, Inc. , 970 F.Supp. 1359, 1364-65 (N.D. Ill. 1997) (internal citations omitted).
In the present case, the Court holds Fastrack's conduct was the cause in fact of Roach's death because it finds that had the appropriate fall protection equipment been available, Roach would have used it and not fallen to his death. Roach expressed an interest in using such equipment on his first day on the job site. It stands to reason that he would have used it if it had been provided; and he certainly would have used it if Wiechens had required him to use it. Fastrack's conduct was also the legal cause of Roach's death because his death was a foreseeable and natural result of Fastrack's allowing him to work more than 36 feet above the ground without fall protection. Had he had access to an appropriate fall arrest system, and been required to use it, he would have fallen no more than six feet before his fall stopped, and he would not have died.
Consequently, Fastrack's violations of 29 C.F.R. §§ 1926.760(a)(1) and (b)(1) caused Roach's death.
Conclusion
The Court finds Defendant Fastrack GUILTY of the sole count in the Information.
The Office of Probation and Pretrial Services shall conduct a presentence investigation *1064 after which the Court will set a sentencing date.
IT IS SO ORDERED.

This violation is a class B misdemeanor punishable by a maximum fine of $500,000.

29 C.F.R. § 1926.760(b)(1) provides in pertinent part: "Each connector shall: Be protected in accordance with paragraph (a)(1) of this section from fall hazards of more than two stories or 30 feet (9.1 m) above a lower level, whichever is less."

A "connector" is an ironworker who is "placing and connecting structural members and components." 29 C.F.R. § 1926.751.

It was critical that the bundle of decking be supported on both ends. If it was not properly supported, a worker who subsequently stepped on the decking might fall through it.

A tie-off or tile choker is a steel cable with loops on the ends which the worker can loop around a truss or a joist to use as an anchorage point. A lanyard properly attached to an anchorage point with a tie-off choker will allow movement of four to six feet. Trusses or joists have panel points, sometimes called "webbing," that prevent an ironworker from moving the entire length of a truss or a joist using just a single choker and lanyard. To move further and remain protected at all times, a second hook and another tie-off choker are needed. A two-choker tie off system works as follows. While still tied off to the truss or joint with the first choker, the ironworker use the second choker to tie off at a spot on the other side of the webbing, further along the truss. Once the second choker is attached, the worker can unhook his lanyard from the first choker to allow forward movement. Although safe, this system is time-consuming because the worker has to unattach and reattach a choker each time he or she encounters panel points or webbing.

A standee or stanchion is a post that is screwed to the decking or a truss and the used as an anchor point.

A retractable, or "yo-yo," is a retracting cable that is hooked to an anchorage point, such as a standee, with the other end hooked to a "D" ring on the back of the ironworker's harness. Retractables come in lengths of up to 50 feet.

A "beamer" is a piece of equipment that is typically attached to the top of a beam or truss. The ironworker's lanyard is attached to the beamer, and the beamer slides along the top of the beam or truss allowing the ironworker to move the length of the beam or truss while remaining tied off.

A static line is a cable attached to two standees and can serve as an anchor point. An ironworker can then attach his lanyard to the cable and travel the length of the deck, truss, or beam without interference.

Gang boxes are boxes in which tools are stored on a job site.

Several credible witnesses testified they saw Oden and Roach walking the trusses without being tied off in the ordinary course of working on the job site. Thus if these witnesses saw Oden and Roach working without being tied off, then Wiechens must have seen them too. He frequently worked in the area where Oden and Roach worked, he spoke to them as they were working on the structure, and it was his job to supervise them. Indeed, another credible witness, Noble (the crane operator), testified he told Wiechens that he saw Oden and Roach walking the trusses without being tied off.
Wiechens' testimony that he did not see or know the two were landing decking without being tied off is not credible. While the Court believes Wiechens could not watch the two at every moment because he had other duties to attend to on the job site and because a lift occasionally obscured his view of the men were doing, his denial that he never saw or knew they were landing decking without being tied off is not credible.

Performing decking work involves "shaking out" or "throwing" the decking by standing on the decking or the joists at the leading edge and placing the sheets on the joists, and then securing the decking to the joists with welds and screws.

Even if Roach was not a Fastrack employee, Fastrack would still be criminally liable for his death under § 666(e). Several circuit courts have held under the multi-employer doctrine that because the statute uses the words "any employee," the class of employees whose deaths will trigger the statute includes other contractors' employees who have regular access to a controlled area and are directly impacted by the violator's actions. United States v. Pitt-Des Moines, Inc. , 168 F.3d 976, 984-85 (7th Cir. 1999).

Fastrack argues "the Government failed to adduce evidence at trial demonstrating that Fastrack or the ARCO worksite were engaged in interstate commerce while constructing the warehouse in Missouri." Def.'s Proposed Findings of Fact and Conclusions of Law at 12 (Doc. 67). It claims the only evidence concerning interstate commerce in the record is from OSHA inspector David Maloney, and he testified only that he'd "have to look" whether Fastrack worked outside the state of Missouri. Id. This statement blatantly ignores the record. Christopher Sharp, a Fastrack estimator called by the Government, testified that before the project at issue in this case which occurred in July 2014, "We [Fastrack] did work in Louisiana. We did work in Oklahoma. We did work in Arizona. Illinois. We did a lot of work in Illinois. Did some work in Tennessee." Tr. at 494.