# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 16, 2011      Decided March 6, 2012

No. 10-1362

DAYTON TIRE, A DIVISION OF BRIDGESTONE/FIRESTONE, INC.,
PETITIONER

v.

SECRETARY OF LABOR,
RESPONDENT

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,
INTERVENOR

———

On Petition for Review of a Final Order of the
Occupational Safety & Health Review Commission

———

*Willis J. Goldsmith* argued the cause for petitioner. With him on the briefs was *Jacqueline M. Holmes*.

*Gary Stearman*, Attorney, U.S. Department of Labor, argued the cause for respondent. With him on the brief were *Joseph M. Woodward*, Associate Solicitor, and *Charles F. James*, Counsel.

*Andrew D. Roth* argued the cause for intervenor. With him on the brief was *Laurence Gold*.

Before: BROWN, GRIFFITH, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*:  In 1994, the Secretary of Labor personally and publically served Dayton Tire with a citation alleging over 100 willful violations of the Occupational Safety and Health Act (the "OSH Act").  Dayton contested the citation, and by 1997, its appeal was before the Occupational Safety and Health Review Commission.  There it sat, fully briefed and untouched, for over twelve years, until the Commission issued an order in 2010 affirming nearly all of the violations and assessing a $1.975 million penalty.

Dayton urges us to set aside the order because of the Commission's lengthy delay.  We grudgingly decline; the Commission's dawdling—while regrettable—did not render its order inequitable or pointless.  We agree with Dayton, however, that the Commission lacked substantial supporting evidence for its finding that the violations were willful. Accordingly, we vacate that portion of the order and remand for the Commission to reassess Dayton's level of culpability. We trust the Commission will act before the decade is out.

I

The "lockout/tagout" standard, or LOTO standard, "covers the servicing and maintenance of machines and equipment in which the *unexpected* energization or start up of the machines or equipment, or release of stored energy[,] could cause injury to employees."  29 C.F.R. § 1910.147(a)(1)(i).  The standard requires employers to "establish a program . . . for affixing appropriate lockout devices or tagout devices to energy isolating devices," *id.* §

1910.147(a)(3)(i); conduct periodic inspections to ensure compliance with the program, *id.* § 1910.147(c)(6)(i); and train employees on the "purpose and function of the . . . program," *id.* § 1910.147(c)(7)(i). "Authorized employees," who perform service and maintenance on covered equipment, must receive more rigorous training than "affected employees," who simply operate covered equipment. *See id.* §§ 1910.147(b), (c)(7)(i)(A), (B).

From 1969 to 2006, Dayton operated a tire-manufacturing facility in Oklahoma City, where it employed a separate company, Ogden Allied, to service and maintain the equipment. When the Occupational Safety and Health Administration ("OSHA") promulgated the LOTO standard in 1989, Dayton's safety manager, Phillip McCowan, reviewed the job tasks at the plant and determined that Dayton employees were only "affected employees" because Ogden employees were responsible for all service and maintenance on site. McCowan's successor as safety manager, Kelley Mattocks, reviewed McCowan's LOTO assessment in 1992 and concluded it was still valid.

In October 1993, a Dayton employee died from injuries he sustained when a machine activated unexpectedly. The incident prompted OSHA to send an inspector to the plant to assess Dayton's LOTO compliance. Based on that inspection, then-Secretary of Labor Robert Reich traveled to Oklahoma City in April 1994 and personally served Dayton with a citation alleging 107 willful LOTO violations and proposing a penalty of roughly $7.5 million. Of those 107 violations, 98 were for failing to train individual Dayton employees to the "authorized" level. The remaining nine violations were for failing to develop adequate safety procedures for particular machines, failing to utilize LOTO procedures, failing to

provide necessary locks and tags to authorized employees, and failing to conduct periodic inspections.

Dayton appealed the citation to the Occupational Safety and Health Review Commission, where it was referred to an administrative law judge. After hearing from 90 witnesses over 31 days of trial, the ALJ issued a decision in 1997 that affirmed each violation that had not been withdrawn by the Secretary. And though the ALJ found that Dayton's "actions were consistent with a good faith belief and effort to comply with the LOTO standard throughout the Oklahoma City plant," he characterized 37 of the violations as willful because Dayton knew its corporate parent, Bridgestone, had previously been cited under the LOTO standard for similar violations. Dayton Tire, 1997 WL 152083 (No. 94-1374, 1997) (ALJ), at *22–23 ("ALJ Ruling"). The ALJ assessed a total penalty of $518,000. *Id.* at *63.

Both Dayton and the Secretary petitioned the Commission for review, and the Commission granted the petitions in March 1997. Then the parties waited, and waited, until September 2010, when a divided Commission affirmed all but one of the violations, and went beyond the ALJ ruling to find all of the violations willful. Dayton Tire, 2010 CCH OSHD ¶ 33,098 (No. 94-1374, 2010) ("Commission Ruling"). The Commission did not rely on the Bridgestone citation to reach its willfulness determination. *Id.* at *18 n.12. Instead, it found that, "over a period of years, Dayton consciously disregarded the LOTO standard by operating . . . in a manner that was patently inconsistent with the requirements of the standard, and by failing to reexamine its violative practices despite receiving information and inquiries that should have led it to do so." *Id.* at *18. The Commission generally assessed larger per-violation penalties than the ALJ—in part

to reflect its broader willfulness determination—and imposed a total penalty of $1.975 million.[1]  *Id.* at *26.

## II

The Administrative Procedure Act (APA) obligates an agency "to conclude a matter presented to it" "within a reasonable time."  5 U.S.C. § 555(b).  Dayton acknowledges that an agency's failure to abide by Section 555(b) does not "require its order[] to be set aside in every or even most cases."  Pet. Reply Br. 17.  But it submits that the order here should be set aside because the "Commission's egregious delay in adjudicating [the] matter defeat[ed] the entire purpose of the underlying enforcement action," and "equity should intervene to prevent enforcement of a senseless order."  *Id.*

The Secretary claims Dayton's argument stumbles out of the gate.  She asserts that the APA remedy for a party aggrieved by agency delay is a petition to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and Dayton's failure to pursue that remedy during the pendency of its appeal precludes it from challenging the timeliness of the Commission's order now.  That reading of the APA is unsupportable.  Section 706(1) does not state that a petition to compel is a party's only option in the face of agency delay.  Nor does it state that a petition to

---

[1] The Commission also stated its "affirmance of each cited violation will result in an abatement order directing Dayton to develop, document, and utilize distinct LOTO procedures for the unique equipment covered by each citation item."  Commission Ruling, 2010 CCH OSHD ¶ 33,098, at *16 n.10.  It is not clear from the record whether the Commission actually issued an abatement order.  In any event, such an abatement order would be moot because it would be directed at Dayton's Oklahoma City plant, and Bridgestone closed that plant in 2006.  Therefore, we will focus only on the Commission's assessment of civil penalties.

compel is a prerequisite for any future challenge to long-delayed agency action. As such, Section 706(1) does not restrict our authority to "set aside agency action . . . found to be . . . not in accordance with law," *id.* § 706(2)(A), including agency action that does not conclude a matter "within a reasonable time," *id.* § 555(b).

Although we are empowered to set aside the Commission's order on the basis of delay, we decline to do so here. Yes, in the words of the Secretary herself, the Commission's twelve-year delay was "excessive and deplorable." Resp. Br. 43. But as Dayton admits—and its cited cases demonstrate—delay alone is not enough; it is the "consequence[s] of the Commission's delay" that dictate whether corrective action is needed. Pet. Reply Br. 18. And in this instance, the consequences of the Commission's delay do not justify setting aside its chosen penalty.

Unlike the petitioner in *TNS, Inc. v. NLRB*, 296 F.3d 384 (6th Cir. 2002), Dayton cannot show that enforcement of the Commission's order would be inequitable. In *TNS*, the court set aside a National Labor Relations Board (NLRB) backpay award because the award "ha[d] potentially been mounting" during the agency's eighteen-year delay, and there was no "reasonable way to hold the [employer] responsible for damages accruing over all of this time." *Id.* at 404. Here, the Commission's delay did not increase Dayton's liability. If anything, it decreased it by giving Dayton more than a decade to earn interest on the money it would have to use to pay the penalty. As for Dayton's assertions of non-financial prejudice from the Commission's delay—that it lacked clear guidance on how to conform to the LOTO standard and could not benefit from a remand to the ALJ because the ALJ had retired—they are factually dubious, and, in any event, not

dependent on whether we enforce the Commission's penalty or not.

Dayton also fails to demonstrate that enforcement of the Commission's penalty would be futile or nonsensical. Dayton relies on *NLRB v. Mountain Country Food Store, Inc.*, 931 F.2d 21 (8th Cir. 1991), and *Emhart Indus. v. NLRB*, 907 F.2d 372 (2d Cir. 1990), but in both cases, the court set aside orders of injunctive relief that had become pointless with the passage of time: in *Emhart*, an order directing an employer to change its method for reinstating striking workers at a particular plant had become useless because the parties had already signed two new collective bargaining agreements addressing reinstatement, and the plant in question had been shut down, 907 F.2d at 380; and in *Mountain Country*, an order directing an employer to permit union members to pass out handbills at its stores had become useless because the union had since been decertified, one of the stores at issue had been relocated, and the number of affected employees had changed, 931 F.2d at 22. Unlike the injunctive relief ordered in those cases, which addressed "ongoing or future violations," the civil penalty assessed here "address[es] past violations," and is based on "the employer's status at the time of the violation." *Reich v. OSHRC*, 102 F.3d 1200, 1202 (11th Cir. 1997). As a result, it has not become outdated because of the Commission's delay.

Dayton maintains enforcement of the penalty would be pointless because "OSHA penalties are meant to inflict pocket-book deterrence," *Kaspar Wire Works, Inc. v. Sec'y of Labor*, 268 F.3d 1123, 1132 (D.C. Cir. 2001), and the penalty here no longer has any deterrent effect: Dayton cannot be deterred from future violations because it no longer exists as a separate entity; Dayton's corporate parent, Bridgestone, need not be deterred because it encouraged Dayton to comply with

its LOTO obligations before the underlying citation issued, and generally has a stellar safety record; and other employers already have been deterred because the deterrent effect occurred "when the citation first issue[d]," Pet. Reply Br. 7.

While the deterrent effect of a single penalty is difficult to assess with much precision, we are confident that enforcement of this penalty will have *some* effect on Bridgestone and employers in general. True, Bridgestone encouraged Dayton to review its LOTO compliance over a year before Dayton received its citation. But if Bridgestone must pay a penalty for LOTO violations committed by one of its divisions, perhaps in the future it will be more insistent when it encourages compliance with health and safety regulations. Although Bridgestone has a strong safety record, there is always room for improvement. As for other employers, the issuance of the underlying citation may well have had a deterrent effect, but the enforcement of the penalty will send the additional message that LOTO violators should expect to pay even when the Commission drags its feet.

Our willingness to enforce the Commission's penalty should not be mistaken for approval of its "deplorable" conduct. Resp. Br. 43. The Commission does a disservice to both employers and employees when it fails to clarify health and safety standards promptly. Nevertheless, in this instance, the Commission's delay did not render its penalty inequitable or inconsistent with the goals of the OSH Act, and we will not set aside an order without a compelling reason to do so.

III

Dayton argues in the alternative that the Commission's finding of willfulness should be vacated because it lacks

substantial supporting evidence.  *See* 29 U.S.C. § 660(a).  We agree.

A violation of the OSH Act can be "serious," "not serious," or "willful."  29 U.S.C. § 666(a)–(c).  For a willful violation, the OSH Act authorizes the Secretary to impose a maximum penalty of $70,000—ten times the maximum penalty for a serious or a not serious violation.  *Id.*  Yet despite defining what a serious violation is (and by negative implication, what a not serious violation is), *see id.* § 666(k), the OSH Act does not define what a willful violation is.  *See Am. Wrecking Corp. v. Sec'y of Labor*, 351 F.3d 1254, 1262 (D.C. Cir. 2003) ("[N]either the [OSH] Act nor Commission regulations define the term 'willful' . . .").

We have defined "willful," however, and our narrow definition reflects the potential severity of the OSH Act's penalty.  A willful violation is "an act done voluntarily with either an intentional disregard of, or plain indifference to, the Act's requirements."  *Ensign-Bickford Co. v. OSHRC*, 717 F.2d 1419, 1422 (D.C. Cir. 1983); *see also AJP Constr., Inc. v. Sec'y of Labor*, 357 F.3d 70, 74 (D.C. Cir. 2004); *A.J. McNulty & Co., Inc. v. Sec'y of Labor*, 283 F.3d 328, 337–38 (D.C. Cir. 2002).  As the Commission has elaborated, to sustain a willful violation, "'[t]he Secretary must show that the employer was actually aware, at the time of the violative act, that the act was unlawful, or that it possessed a state of mind such that if it were informed of the standard, it would not care.'"  *AJP Constr.*, 357 F.3d at 74 (quoting *Sec'y of Labor v. Propellex Corp.*, 1999 CCH OSHD ¶ 31,792 (No. 96-0265, 1999), at *8).  A "good faith, reasonable belief by an employer that its conduct conformed to the law negates a finding of willfulness."  *A.J. McNulty*, 283 F.3d at 338.

Here, the Secretary argued before the ALJ that Dayton "either intentionally disregarded or was plainly indifferent to the requirements of the LOTO standard as a matter of corporate policy throughout the Oklahoma City facility." ALJ Ruling, 1997 WL 152083, at *16. Dayton countered that it had "attempted in good faith to comply with the provisions of the LOTO standard." *Id.* at *18. After reviewing the relevant testimony and evidence at some length, *id.* at *18–21 the ALJ sided with Dayton, finding that the actions of Dayton's safety managers, Phillip McCowan and Kelley Mattocks, demonstrated that "an effort was made to comply with the standard on a plant wide basis." *Id.* at *21. The ALJ did deem some of Dayton's violations willful, however, because Dayton's apparent failure to review a LOTO citation for another Bridgestone facility and correct similar deficiencies at the Oklahoma City plant showed "plain[] indifferen[ce] to the requirements of the LOTO standard for the activities and machines listed in the [Bridgestone] citation." *Id.* at *23.

On appeal, the Commission found that Dayton acted willfully, albeit on different grounds than did the ALJ. It found the "evidence [did] not support the [ALJ]'s decision to characterize . . . particular citation items as willful" because the record was "silent regarding the actions of plant management after receiving the . . . [Bridgestone] citation." Commission Ruling, 2010 CCH OSHD ¶ 33,098, at *18 n.12. Yet it found sufficient evidence to conclude that Dayton had willfully violated the OSH Act as a matter of corporate policy. In the Commission's telling, McCowan's initial assessment that only Ogden employees performed tasks covered by the LOTO standard was "plainly erroneous," *id.* at *19; Mattocks "adopted and perpetuated [McCowan's] approach without ever conducting her own assessment," *id.* at *20; and Mattocks ignored five separate warnings to review

Dayton's LOTO compliance in the year or so following her adoption of McCowan's approach, *id.* at *20–23. On the strength of those findings, the Commission proclaimed that "Mattocks either knew that her predecessor's LOTO analysis was incorrect or chose to avoid such knowledge by refusing to conduct her own assessment." *Id.* at *24. And because "Dayton's failure to comply with the cited provisions hinge[d] on its reliance on Mattocks's unfounded determination," all of Dayton's violations were willful. *Id.*

The linchpin of the Commission's willfulness determination is its finding that Mattocks either knew Dayton was non-compliant or was unwilling to investigate for fear of uncovering Dayton's non-compliance. We think that finding is based more on speculation than evidence. Accordingly, the Commission's willfulness characterization does not withstand our review.

The Commission does not cite a single piece of evidence indicating that Mattocks "was actually aware, at the time of the violative act, that the act was unlawful." *AJP Constr.*, 357 F.3d at 74. Its statements about Mattocks invariably focus on her failure to investigate Dayton's compliance, rather than her actual knowledge of Dayton's non-compliance. *See, e.g.*, Commission Ruling, 2010 CCH OSHD ¶ 33,098, at *24 ("Mattocks's steadfast refusal to reassess the basis of . . . McCowan's decision to exempt Dayton from the bulk of the standard's requirements was nothing short of obstinate."). Indeed, the Commission quotes Mattocks' testimony that she "believed that we [Dayton] were within full compliance." *Id.* at *21 n.16. Thus, the Commission is left only with its finding that Mattocks "chose to avoid such knowledge [of Dayton's non-compliance] by refusing to conduct her own assessment," *id.* at *24—that Mattocks was, in other words,

"plain[ly] indifferen[t] to . . . the Act's requirements." *Ensign-Bickford*, 717 F.2d at 1422.

Although there is some supporting evidence, there is not enough, particularly "when contradictory evidence is taken into account." *Am. Wrecking Corp.*, 351 F.3d at 1261. As our cases demonstrate, it takes a lot to be plainly indifferent. We have affirmed the Commission's finding of plain indifference when there was evidence the company had disregarded repeated warnings from an employee that it was in violation of safety standards, and had failed to "make *any* effort to address the safety problems." *AJP Constr.*, 357 F.3d at 74 (emphasis added). We have also affirmed a finding of plain indifference on the basis of evidence that a company had ignored repeated reports from its own safety engineer that its facilities contained "hundreds of safety type violations." *A.E. Staley Mfg. Co. v. Sec'y of Labor*, 295 F.3d 1341, 1346 (D.C. Cir. 2002). Here, the Commission relies primarily on Mattocks' responses to five incidents to show that she was plainly indifferent. But those responses evince negligence at most.

The first two incidents occurred in 1992. After a safety training session, certain Dayton employees raised concerns about whether they should be treated as authorized employees instead of affected employees. A few months later, Bridgestone's new safety director sent a memo to all Bridgestone safety personnel encouraging them to "revisit" their LOTO practices. Commission Ruling, 2010 CCH OSHD ¶ 33,098, at *21. In response to these two events, Mattocks (in the Commission's words) "asked Dayton's various production supervisors whether the nature of any of the jobs performed by Dayton employees had changed since McCowan had first determined that all of those employees should be classified as affected." *Id.* When she did not

receive any "indication from supervisors that any of the jobs had changed, she ended her inquiry." *Id.* While Mattocks could have done more, she did not do nothing.

The third incident took place in 1993. In the Commission's telling, Mattocks did nothing after Faye Kearney, an OSHA ergonomics inspector, toured the Oklahoma City plant and expressed her concerns about Dayton's LOTO compliance for certain machines. *Id.* at *21–22. Setting aside the Commission's decision to credit Kearney's testimony over Mattocks', *see id.* at *32–33 (Thompson, Comm'r, dissenting) (arguing Commission erred in this respect), and assuming Kearney told Mattocks what she claimed to have told her, Mattocks' inaction was reasonable. Kearney was "an industrial hygienist" who "admitted that she specialized in health-related inspections, not safety-related inspections." *Id.* at *33. Even Kearney's OSHA supervisor discounted her concerns about Dayton's LOTO compliance because he was uncomfortable with her level of expertise. *Id.* We cannot find Mattocks plainly indifferent for doing the same.

In response to the fourth event—the death of a Dayton employee in October 1993—Dayton managers "investigated how the accident occurred" and determined "LOTO was not . . . relevant," but "committed to reexamining the application of LOTO to Dayton's entire operation." *Id.* at *23. When the managers reminded Mattocks of this commitment, she conducted "some review of the LOTO standard" and concluded that Dayton was still in compliance. *Id.* Again, while Mattocks' review may not have been as thorough as the Commission would have liked, it did not display plain indifference.

The fifth and final incident occurred in November 1993, when OSHA inspector George McCown came to the Oklahoma City plant to review Dayton's LOTO compliance. Following the inspection, McCown "reviewed with [Mattocks] the alleged LOTO violations" in various departments, and "Mattocks never acted on McCown's admonitions" before OSHA issued the underlying citation in April 1994. *Id.* at *23. Mattocks' inaction in the face of McCown's views is not sufficient proof of indifference. In an analogous situation, the Commission stated that "an employer is entitled to have a good faith opinion that his conduct conforms to regulatory requirements," and "such conduct should not be construed as constituting a willful violation of the [OSH] Act merely because Labor holds a contrary opinion on the facts and advises the employer of that opinion." *C.N. Flagg & Co., Inc.*, 2 BNA OSHC 1539 (No. 1409, 1975), at *2.

Indeed, what the ALJ acknowledged and the Commission dismissed was the possibility of good faith. The LOTO standard covered servicing and maintenance and exempted production processes. Because service and maintenance at the Oklahoma City plant was the responsibility of an independent company, McCowan concluded Dayton employees were not covered. Mattocks followed his lead. Dayton and the Secretary clearly disagreed about the scope of the exemption and the Secretary's view prevailed. But a difference in interpretation—even a persistent one—is not synonymous with willfulness, particularly when, as here, the Commission relies on rulings issued after the underlying citation to resolve the interpretive dispute. *See* Commission Ruling, 2010 CCH OSHD ¶ 33,098, at *5–7; *see also McLaughlin v. Union Oil Co.*, 869 F.2d 1039, 1047 (7th Cir. 1989) (holding that a willful violation "would have to be apparent at the time committed," and that a "violation is not

willful when it is based on a nonfrivolous interpretation of OSHA's regulations").

Mattocks may not have displayed the kind of initiative we would expect when lives and limbs are at stake. But the evidence before the Commission did not establish that Mattocks "possessed a state of mind such that if [she] were informed of the standard, [she] would not care." *AJP Constr.*, 357 F.3d at 74. Mattocks made *some* effort to ensure Dayton's LOTO compliance, and under these circumstances, some effort is enough to save Dayton from a willfulness determination.

## IV

The Commission lacked substantial supporting evidence for its finding that Dayton's violations were willful. Accordingly, we vacate that portion of the Commission's order and remand for the Commission to reassess the nature of Dayton's violations and recalculate the appropriate penalty. We affirm the Commission's order in all other respects.

*So ordered*.