# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 21, 2020        Decided June 16, 2020

No. 18-5343

SOLENEX LLC, A LOUISIANA LIMITED LIABILITY COMPANY,
APPELLEE

v.

DAVID LONGLY BERNHARDT, SECRETARY, U.S. DEPARTMENT
OF THE INTERIOR, ET AL.,
APPELLEES

BLACKFEET HEADWATERS ALLIANCE, ET AL.,
APPELLANTS

———

Consolidated with 18-5345

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cv-00993)

———

*Brian C. Toth*, Attorney, U.S. Department of Justice, argued the cause for federal appellants. With him on the briefs were *Jeffrey Bossert Clark*, Assistant Attorney General, *Eric A. Grant*, Deputy Assistant Attorney General, *Stephen A. Vaden*, General Counsel, U.S. Department of Agriculture, and *Charles E. Spicknall*, Attorney.

*Timothy J. Preso* argued the cause and filed the briefs for intervenor-appellants.

*Joel West Williams* and *Kim Jerome Gottschalk* were on the brief for *amicus curiae* Blackfeet Tribe in support of appellants and reversal of the district court.

*David C. McDonald* argued the cause for appellee. With him on the brief were *Ivan L. London*, *Zach W. Fitzgerald*, and *Zhonette M. Brown*. *Christian B. Corrigan* entered an appearance.

*Rebecca W. Watson* was on the brief for *amicus curiae* Western Energy Alliance in support of appellee and the decision below.

Before: TATEL, GARLAND, and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: The Badger-Two Medicine Area ("Two Medicine Area") is a region of unique cultural, religious, spiritual, historical, and environmental significance. Solenex LLC holds an oil and gas lease ("Lease") over a portion of that area. In 2016, the Secretary of the Interior cancelled the Lease because of the Two Medicine Area's multi-faceted significance and Interior's failure to conduct the proper pre-lease analyses required under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the National Historic Preservation Act ("Historic Preservation Act"), 54 U.S.C. §§ 300101 *et seq.* When Solenex challenged that cancellation decision, the district court ruled in its favor. The court held that the amount of time that had elapsed between the Lease's issuance and its cancellation violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et*

*seq.*, and that the Secretary failed to consider Solenex's reliance interests before cancelling the Lease.

Each of those determinations was erroneous. First, delay by itself is not enough to render the Lease cancellation arbitrary or capricious. Second, the Secretary did consider, and in fact compensated, Solenex's identified reliance interests. For those reasons, we vacate the district court's judgment.

**I**

**A**

The Two Medicine Area has long held a special place in the cultural history and religious life of the Blackfeet Tribe. The Tribe's oral history describes how its people began to suffer and die shortly after the world's creation. Seeing that suffering, the Creator returned to the Blackfeet and took them into the countryside and mountains of what would become the traditional Blackfeet territory, including the Two Medicine Area. There, the Creator introduced the Blackfeet to healing trees, bushes, and plants, and taught them how to seek the Creator and other spirits. Seeking those spirits, which is "a central and inseparable part of [the Tribe's] religion and lifeway," requires the Blackfeet to be in the proper geographical location and to undertake special preparations for religious ceremonies in the area. J.A. 2021, 2029.

The Two Medicine Area's topography includes high mountain peaks and river valleys, and it offers relative isolation and a supply of high-quality plants, animals, and minerals, all of which are central to the Blackfeet people's religious, spiritual, and cultural practices. For those reasons, it remains a place of spiritual power for the Blackfeet people because "[i]t is there that the spirits remain" and where the Blackfeet "can go, as they have been for centuries in accordance with their

beliefs and traditions, to be alone near Creator Sun while still standing on Mother Earth so that their prayers can be heard by these two Creators[.]" J.A. 2023.

Many of those same religious and cultural characteristics render the Two Medicine Area environmentally significant. The Two Medicine Area is bounded by Glacier National Park, the Scapegoat and Bob Marshall Wilderness Areas, and the present-day Blackfeet Indian Reservation. The Two Medicine Area functions as a habitat for a number of species, including bald eagles, peregrine falcons, grizzly bears, elk, wolves, lynx, and wolverines, and it serves as a "critical wildlife movement corridor[.]" J.A. 327. In recognition of its critical environmental status and to preserve the region, the United States Forest Service in 2009 banned motorized vehicles from all trails and prohibited snowmobiling.

**B**

In June 1982, the Bureau of Land Management, which is housed within the Department of the Interior, issued oil and gas leases within the Two Medicine Area. One of those leases was issued to Sidney Longwell. To obtain the Lease, Longwell paid the first year's rental fee, in the amount of $1 per acre, totaling $6,247.00.

The Lease did not convey an unrestricted right to drill. Instead, Longwell was required to obtain permission from both the Bureau and the Forest Service before drilling could occur.[1] The Environmental Assessment conducted by the Forest Service before the Lease was issued expressly reaffirmed the contingent nature of the right. As the Environmental Assessment explained, the "decision to lease is only the first

---

[1] The Bureau manages subsurface mineral rights, while the Forest Service handles surface activities on certain federal lands.

step of a multi-step decision process." J.A. 2222. The Forest Service recognized that the Two Medicine Area "may contain areas of spiritual importance," and that "the Blackfeet people prefer[red] to identify th[o]se areas on a project-by-project basis." J.A. 2254. If mitigation of any negative effects was "not possible[,]" then "the area may be avoided completely[.]" J.A. 2280.

In addition to the explicitly contingent status of drilling, the Lease provided that it was "subject to all rules and regulations of the Secretary of the Interior now or hereafter in force, when not inconsistent with any express and specific provisions herein[.]" J.A. 2106. In July 1983, approximately one year after issuing the Lease, Interior amended its regulations to make clear that "[l]eases shall be subject to cancellation if improperly issued." Minerals Management and Oil and Gas Leasing on Federal Lands, 48 Fed. Reg. 33,648, 33,674 (July 22, 1983).

One year after receiving the Lease, Longwell assigned it to three companies: America Petrofina Company of Texas, Petrofina Delaware, Inc., and AGIP Petroleum Company (collectively, "Fina"). Longwell retained a production payment based on the value of any oil and gas produced in the future from the Two Medicine Area. J.A. 42.

Fina submitted an application on November 21, 1983, for permission to drill in the Two Medicine Area. The Bureau, the Forest Service, and the Montana Department of Fish, Wildlife, and Parks jointly conducted a proposed Environmental Assessment analyzing the impact of drilling on the environmental, historical, cultural, and religious significance of the area. The Fish and Wildlife Service issued a biological opinion in which it concluded that "the proposed action would jeopardize the grizzly bear and gray wolf," which were

threatened species. J.A. 657. A modification to the proposed drilling action was subsequently made, and the Area Manager for the Bureau approved the revised application on January 31, 1985.

Several conservation groups and the Blackfeet Tribe filed an administrative appeal with the Interior Board of Land Appeals ("Interior Appeals Board"). The conservation groups and the Tribe alleged that the approval violated NEPA, the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, the Archeological and Historic Preservation Act, *id.* §§ 469 *et seq.*, and the Range Land Renewable Resources Planning Act, *id.* §§ 1600 *et seq.* The Interior Appeals Board agreed in part, setting aside the Bureau's grant of the drilling application because, among other things, it failed to consider whether cultural resources would be impacted by the location of a proposed access route.

In the wake of that decision, Fina chose to seek relief from Interior and requested that the Lease be suspended. That request was granted, and the Lease was placed in suspension on October 1, 1985. As a result, the agency suspended Fina's "rental and minimum royalty payments" to Interior and tolled the Lease term. J.A. 2213. The Lease, and the leaseholders' obligations under it, have remained in suspension to the present day.

The application to drill went through a series of additional appeals and remands. In April 1987, the Bureau approved the drilling application. On administrative appeal, the Bureau requested and obtained a voluntary remand.

On remand, the Bureau and the Forest Service finally undertook a comprehensive environmental, cultural, and historical study and prepared an Environmental Impact Statement, *see* 42 U.S.C. § 4332(2)(c). The Environmental

Impact Statement covered the applications by Fina and another company to drill in the same portion of the Two Medicine Area. The Statement documented that the Two Medicine Area "possesses characteristics which are considered important for the practice of traditional culture and religion," and that Tribal members "value the area's clean air and water, the limited access which affords less chance of disturbance, and the beauty of the relatively undisturbed environment." J.A. 1109.

The Blackfeet Tribe expressed the critical need to maintain the Two Medicine Area as one of its last surviving spiritual sites, since other sites had already been subjected to extensive tourist activity and ongoing mineral exploration. The widescale destruction of spiritual environs for the Tribe raised the specter that "this generation and future generations [would] not have future opportunities to practice religion in an undisturbed environment." J.A. 1110.

Despite those concerns, the Bureau again approved Fina's drilling application in February 1991. An administrative appeal followed, and the Bureau once again requested a voluntary remand.

In 1993, the Bureau approved the application to drill. Conservation groups and members of the Blackfeet Tribe filed suit in federal court, alleging violations of the APA, NEPA, the Historic Preservation Act, the American Indian Religious Freedom Act, 42 U.S.C. §§ 1996 *et seq.*, and the Convention Concerning the Protection of the World Cultural and Natural Heritage, Nov. 16, 1972, 1037 U.N.T.S. 151. That suit was subsequently stayed in light of legislation introduced in Congress that would have banned surface-disturbing activities in the Two Medicine Area, including drilling, *see* Badger-Two Medicine Protection Act, S. 853, 103d Cong. (1993).

While the legislative ban on drilling was being considered, the Forest Service concluded that there was "a property eligible for the National Register of Historic Places" within the Two Medicine Area. J.A. 1308. To facilitate the Service's review process, the Lease's suspension was repeatedly reauthorized through the "conclusion of the historic property review." J.A. 1318. On April 5, 1999, while the Lease remained in suspension, Fina assigned it back to Longwell.

In 2002, the Forest Service designated the "Badger-Two Medicine Blackfoot Traditional Cultural District" as eligible for listing in the National Register of Historic Places based on the Blackfeet Tribe's use of "the lands for traditional purposes for generations[.]" J.A. 2059. That Cultural District adjoined and later fully incorporated the area covered by the Lease. Longwell was informed of the Service's determination, and the Bureau confirmed that the Lease suspension would continue until the Historic Preservation Act and NEPA issues were resolved.

In the midst of those administrative and legislative proceedings focused on the Two Medicine Area's eligibility for drilling, Solenex, a company founded by Longwell, chose to acquire the Lease in July 2004.

In 2006, shortly after Solenex acquired the Lease, Congress withdrew the Two Medicine Area from "disposition under all laws relating to mineral * * * leasing," subject to valid existing rights. *See* Tax Relief and Health Care Act, Pub. L. No. 109-432, div. C, § 403(b)(1)(B), 120 Stat. 2922, 3050–3051. Congress also provided tax incentives for leaseholders who willingly relinquished their leases. *Id.* § 403(c), 120 Stat. at 3051.

**C**

Solenex chose not to obtain the relief that Congress offered in the 2006 legislation. Instead, on June 28, 2013, Solenex filed suit, asserting that the relevant agencies unreasonably delayed and withheld permission for drilling. In July 2015, the district court granted summary judgment to Solenex, concluding that the agencies engaged in unreasonable delay, and ordered them to submit, within 21 days, a schedule for resolution of the Lease's suspension. *See Solenex v. Jewell*, 156 F. Supp. 3d 83, 85–86 (D.D.C. 2015). After subsequent proceedings, the court ordered the Bureau "to determine by November 23, 2015 whether to initiate the process for cancellation of the [L]ease." J.A. 252.

Meanwhile, in September 2015, the Advisory Council on Historic Preservation recommended that the drilling approval be revoked and that the Lease be cancelled. J.A. 331, 214–217. The Council stated that "the Solenex exploratory well along with the reasonably foreseeable full field development would be so damaging to the [traditional cultural district] that the Blackfeet Tribe's ability to practice their religious and cultural traditions in this area as part of their community life and development would be lost." J.A. 331. The Council recommended that the drilling permit be revoked, the Lease cancelled, and the Two Medicine Area safeguarded from any future mineral development.

After further inter-agency consultation, the Secretary informed the court on November 23rd that the agency would be initiating cancellation procedures. Solenex did not respond to that filing for nearly two months. After a brief stay and further dispute, the district court held a status conference on March 16, 2016. The court then requested that the Secretary issue a decision in the next 24 hours.

To comply with the district court's 24-hour timeline, Interior issued a written decision cancelling the Lease on March 17th. J.A. 326-341. The Secretary explained that cancellation was necessary because drilling would violate both NEPA and the Historic Preservation Act. The Secretary stated at the outset that an environmental impact analysis should have been made prior to the initial leasing decision. But it was not. Instead, the agency's Environmental Assessment for leasing erroneously delayed that environmental analysis until the receipt of applications for surface-disturbing activity like drilling. In addition, the Environmental Assessment failed to consider a no-action alternative regarding leasing as the law requires. The Secretary further acknowledged that the agency had failed to meet the requirements of the Historic Preservation Act in issuing the Lease. The Secretary explained, in particular, that the agency had failed to undertake the required consultation efforts prior to issuance and, instead, wrongly delayed compliance with that Act to the drilling approval stage. As a result, the Secretary determined that the Lease was voidable.

The Secretary then concluded that there was no viable way to make the Lease valid. In the intervening years, Congress had "permanently prohibited oil and gas leasing in the Badger-Two Medicine area." J.A. 338 (citing Tax Relief and Health Care Act, div. C, § 403(b)(1)(B), 120 Stat. at 3050–3051). As a result, the Secretary determined that it could not lawfully re-validate the Lease. The Secretary stated, lastly, that even if the agency had retained discretion to validate the Lease, "the facts as discussed * * * d[id] not warrant doing so." J.A. 338.

In the wake of the cancellation decision, Solenex filed a supplemental complaint challenging the cancellation. Specifically, Solenex asserted that the Secretary lacked the legal authority to cancel the Lease; Solenex was protected as a

*bona fide* purchaser; and the cancellation decision was arbitrary and capricious. Solenex also argued that the decision was barred by estoppel, laches, and the statute of limitations.

On September 24, 2018, the district court granted summary judgment in favor of Solenex. *See Solenex LLC v. Jewell*, 334 F. Supp. 3d 174, 177 (D.D.C. 2018). The court concluded that it need not decide whether the Secretary possessed the legal authority to cancel the Lease "because this case turn[ed] on its unique facts." *Id.* at 181. "[E]ven assuming the authority to administratively cancel leases," the district court ruled, the Secretary's "failure to consider the reliance interests at stake in cancelling [the Lease] and the accompanying [drilling application approval] after three decades" violated the APA. *Id.* at 182.

The district court based its APA ruling specifically on the amount of "time that ha[d] elapsed and the resulting reliance interests at stake." *Solenex*, 334 F. Supp. 3d at 182. The district court cited caselaw holding that unreasonable agency delay in taking an action violated the APA. In the district court's estimation, "[t]he same logic applie[d] here." *Id.* Assuming that the Secretary had the authority to administratively cancel the Lease based on error in its initial issuance, the district court ruled that "[a]n unreasonable amount of time to *correct* an alleged agency error, especially where the record shows that error was readily discoverable from the beginning, violates the APA." *Id.*

The district court added that "[a]gency delay of course has a practical effect: it creates reliance interests." *Solenex*, 334 F. Supp. 3d at 183. That was "particularly true in the context of agency *reconsideration* of its decision to grant [Solenex] certain interests, [because] 'such reconsideration must be timely.'" *Id.* (quoting *Prieto v. United States*, 655 F. Supp.

1187, 1191 (D.D.C. 1987)). The district court concluded that the "federal defendants not only failed to consider the reliance interests at stake, they dismissed them out of hand," *id.*, which constituted "arbitrary and capricious agency action," *id.* at 184 (internal quotation marks omitted).

The district court then remanded the matter to the Secretary "with the order that the Solenex [L]ease be reinstated." *Solenex*, 334 F. Supp. 3d at 184. The Secretary and intervenors timely appealed.

**II**

The district court exercised subject matter jurisdiction under 28 U.S.C. § 1331. This court's jurisdiction arises under 28 U.S.C. § 1291.

We review de novo the district court's grant of summary judgment. *Silver State Land, LLC v. Schneider*, 843 F.3d 982, 989 (D.C. Cir. 2016). "An agency's action withstands review under the Administrative Procedure Act unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)).

**III**

The district court's reliance on agency delay and Interior's asserted failure to consider Solenex's reliance interests finds no purchase in circuit precedent or the administrative record.[2]

---

[2] On appeal, Solenex primarily argues for affirmance on grounds not relied upon by the district court, arguing that the Secretary did not have the legal authority to cancel the Lease, Solenex Br. 27, and that the agency relied on improper factors, *id.* at 36. We decline to address those arguments for the first time on appeal. *See Liberty Property Trust v. Republic Properties Corp.*, 577

**A**

**1**

The district court rested its summary judgment decision in significant part on what it concluded was undue delay in the decision to cancel the Lease. *Solenex*, 334 F. Supp. 3d at 182–183. But the law is well settled that "[d]elay alone is not enough" to strip the agency of its ability to act or to justify setting aside agency action. *Dayton Tire v. Secretary of Labor*, 671 F.3d 1249, 1253 (D.C. Cir. 2012); *see also General Motors Corp. v. United States*, 496 U.S. 530, 541 (1990) (holding agency's failure to act on an implementation plan within a reasonable period of time did not itself preclude enforcement of the plan); *Linemaster Switch Corp. v. EPA*, 938 F.2d 1299, 1304 (D.C. Cir. 1991) ("We are especially reluctant to * * * curb [an agency's] substantive authority in light of Supreme Court decisions declining to restrict agencies' powers when Congress has not indicated any intent to do so and has crafted less drastic remedies for the agency's failure to act."); *United States v. Popovich*, 820 F.2d 134, 138 (5th Cir. 1987) ("Today we squarely face whether section 706 and 555 of the APA may be used not only to compel but also to bar agency action unreasonably delayed. We conclude that the plain language of the statute provides no authority for dismissing the action of the [agency].").

That rule applies even to lengthy periods of agency delay. For example, in *Dayton Tire*, we declined to invalidate agency action on the ground that it was taken after a twelve-year delay, even though the agency itself characterized that lag as

---

F.3d 335, 341 (D.C. Cir. 2009) ("Although we * * * have the discretion to consider questions of law that were not passed upon by the District Court, this court's normal rule is to avoid such consideration.") (formatting modified).

"excessive and deplorable." 671 F.3d at 1253. What matters, this court explained, is not the prolongation itself. Rather, it is the actual "consequences of the * * * delay that dictate whether corrective action is needed." *Id.* (formatting modified).

To be sure, the APA gives courts the authority to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1); *see also Nader v. FCC*, 520 F.2d 182, 206–207 (D.C. Cir. 1975). But that distinct authority says nothing about whether agency action that *has been taken* can be invalidated based solely on the amount of time preceding that action.

In other words, delay itself does not render agency action unlawful. What matters for the arbitrary-and-capricious analysis are the identified consequences or harms that flow from the agency delay.

**2**

Given that precedent, the district court misstepped by relying on delay alone to invalidate the Lease's cancellation. In the district court's estimation, "[a]n unreasonable amount of time to *correct* an alleged agency error, especially where the record shows that error was readily discoverable from the beginning, violates the APA." *Solenex*, 334 F. Supp. 3d at 182. But because a party challenging agency action must identify something more than mere delay—it must identify harmful consequences emanating from that delay that were not reasonably taken into account by the agency—Interior's action cannot be overturned based on the district court's concerns about delay alone.

Both the district court and Solenex failed to point to any actual adverse consequences arising from the delay itself. That is unsurprising because the Secretary kept the running of the

Lease term suspended during each round of administrative and judicial review and tolled the leaseholders' obligation to pay rents and royalties to the agency.

Beyond that, the reasonableness of delay is a function of context. Here, it was the product of extensive and complex environmental, cultural, historical, and religious challenges to the agency decision, which were then compounded by intervening legislation that forbade drilling in the area—which was the sole purpose of the Lease, *see* J.A. 2107.

Importantly, prior to the Lease's issuance, the relevant Environmental Assessment provided explicit notice that the "decision to lease is only the first step of a multi-step decision process." J.A. 2222. Any subsequent proposal to drill on the land would "be subjected to an environmental analysis" that would "consider not only the effects of the proposal on the lease area, but also the cumulative effects of the proposal in relation to other activities in the affected area." *Id.*; *see also id.* at 2237 (stating that "[t]he cumulative effects of oil and gas activity * * * are impossible to predict at this time" and that the Forest Service intends "to evaluate the cumulative effects of each exploration proposal through the environmental analysis of that proposal").

The same limitations applied as to the cultural impact of surface-disturbing activity. The Environmental Assessment noted that the Two Medicine Area was of unique cultural and religious significance. *See* J.A. 2254 It therefore expressly cautioned that, "[t]o insure compliance with the American Indian Religious Freedom Act, consultation with the Blackfeet Tribe w[ould] be undertaken for all exploration and development proposals within the [Two Medicine Area]." J.A. 2260; *see also* J.A. 2270 ("There is no need for a cultural resources inventory at this time because site-specific

inventories will be conducted prior to surface disturbance."); J.A. 2280 (stating that compliance with the Historic Preservation Act and the American Indian Religious Freedom Act "will be required at the time soil disturbing activities are proposed").

Given those significant disclosures, warnings, and conditions, as well as clear advance notice of the analyses that would be required prior to any drilling authorization, it is no surprise that the drilling application was delayed. Fina submitted its drilling application in November 1983. But an administrative appeal quickly followed, during which Fina requested that the Lease be suspended, and the company excused from obligations under its terms. The agency obliged, suspending all "rental and minimum royalty payments" and tolling the Lease term. J.A. 2213.

A series of administrative appeals carried the suspended Lease through 1987, and the agency was subsequently tasked with developing an Environmental Impact Statement, which was completed in October 1990. More administrative appeals ensued. Then, following the Two Medicine Area's inclusion as part of a registered historic place in 2002, the agency engaged in a series of consultation meetings with both Solenex and the Tribe. Those meetings proved fruitless.

All the while, the leaseholders agreed to allow the Lease to remain in suspension and to avoid any accompanying obligations on their part. That includes Solenex—a company founded by Longwell, who had been involved in these proceedings from the beginning—which chose to acquire the Lease in 2004 against that backdrop of administrative, judicial, and legislative proceedings and without any valid drilling permit in place.

In short, from the Lease's inception, the various leaseholders, including Solenex, were aware that the NEPA and Historic Preservation Act analyses would be necessary prior to any surface-disturbing activity and that drilling permits were not guaranteed. The Secretary's painstaking efforts to ensure that the agency's statutory duties were met distinguishes this case from a long period of unexplained agency inaction. A failure to cancel the Lease earlier in the process, with less information, could not have been the sounder or legally compelled course of action.

For all of those reasons, the district court erred in holding that the Secretary's alleged delay, standing alone, rendered the agency's cancellation of the Lease arbitrary and capricious.

**B**

Neither the district court's nor Solenex's complaints about the Secretary's consideration of reliance interests holds up as a basis for invalidating the Lease cancellation.

The district court relied on a generalized reference to "reliance interests" to conclude that the cancellation decision was arbitrary and capricious. *Solenex*, 334 F. Supp. 3d at 183–184. But unidentified and unproven reliance interests are not a valid basis on which to undo agency action. Instead, the harm occasioned must be specifically identified, reasonably incurred, and causally tied to the delay. *See Mingo Loan Coal Co. v. EPA*, 829 F.3d 710, 722–723 (D.C. Cir. 2016); *see also Bell Atlantic Tel. Cos. v. FCC*, 79 F.3d 1195, 1207 (D.C. Cir. 1996) (stating that reliance interests incurred when an issue had long been in dispute were not reasonable, and evaluating only "investment incurred in reliance on the prior" position).

The district court made no such particularized finding of actual harm to specific reliance interests caused by the delay.

Instead, the district court seemed to assume that harm to reliance interests was the inevitable byproduct of the agency's delay. *See Solenex*, 334 F. Supp. 3d at 183 ("Agency delay of course has a practical effect: it creates reliance interests."). But assumptions are not evidence.

Solenex asserts that the district court's decision is correct because the record shows that the company did identify relevant reliance interests. There are two problems with that argument.

*First*, the district court overturned the agency's decision for an alleged *failure to consider* reliance interests. But the reliance interests that Solenex flags were, in fact, specifically considered and addressed by the Secretary. In an affidavit submitted to the district court, Longwell "estimate[d]" that "Solenex and I have spent over $35,000 in seeking to develop the [L]ease" since the Lease was issued. J.A. 45.

The Secretary adequately considered and addressed that reliance interest in the cancellation decision, and even offered to refund to Solenex the rent paid by Solenex's predecessors in the amount of $31,235, which approximates the "estimate" provided by Longwell to the district court. Other than those funds, Solenex identifies no other reliance interests that the Secretary failed to consider or address when making the cancellation decision. *See* Oral Arg. Tr. 27:19–22 (Q: "I'm just asking you is there another place that you can point me other than to this $35,000 number?" A: "No, Your Honor.")

*Second*, Solenex itself—the only party suing here—incurred no expenses at all in developing the Lease. Solenex did not even acquire the Lease until July 2004, and it claims no financial investment of its own in the Lease. The expenses to which Solenex refers and which the Secretary remedied were incurred by Longwell or other entities, who are not the current

holders of the Lease or parties to this action. *See* J.A. 45; *cf.* Solenex Br. 33 ("Solenex *and its predecessors* spent considerable time, effort, and resources pursuing the right to drill on the Lease[.]") (emphasis added).

That lack of investment by Solenex was understandable given the circumstances at the time of its acquisition of the Lease. For the twenty-one preceding years, the Secretary had asserted the power to cancel leases that were improperly issued. *See* 48 Fed. Reg. at 33674 ("Leases shall be subject to cancellation if improperly issued."). By 1985, administrative appellants in the drilling proceedings raised substantial NEPA compliance issues. And the Lease had been in suspension for nineteen years by the time Solenex acquired it. In 2002, again before Solenex acquired the Lease, the Badger-Two Medicine Blackfoot Traditional Cultural District was deemed eligible for listing in the National Register of Historic Places. Following that determination, the Bureau confirmed that the suspension would continue until NEPA and Historic Preservation Act issues were resolved. *See* J.A. 330.[3]

In sum, the record fails to identify any reliance interests reasonably incurred by Solenex at all, and the sole investment of funds made by owners preceding Solenex was expressly addressed and offered redress by the Secretary. Congress too offered relief in the form of tax incentives for those affected by its legislative prohibition on drilling and mineral development

---

[3] To the extent that the district court suggested in passing that the Secretary acted in bad faith by cancelling the Lease, nothing in the record remotely supports such an assertion.

in the area.  *See* Tax Relief and Health Care Act, div. C., § 403(c), 120 Stat. at 3051.[4]

## IV

The district court erred when it entered summary judgment in Solenex's favor.  The alleged delay did not, standing alone, render the cancellation decision invalid.  Nor did the Secretary fail to consider identified reliance interests.  For those reasons, we vacate the district court's grant of summary judgment to Solenex and remand for further proceedings consistent with this opinion.

*So ordered.*

---

[4]  We note that an agency decision to cancel a lease does not preclude the owner from raising breach of contract claims in the Court of Federal Claims.  *See Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 176 (2014).